In re GEORGETOWN BUILDING
ASSOCIATES, LIMITED
PARTNERSHIP, Debtor.

Citicorp Real Estate, Inc., Plaintiff,

v.

PWA, Inc., et al., Defendants.

Bankruptcy No. 97–02262.
Adversary No. 98–0086.

United States Bankruptcy Court,
District of Columbia.

Oct. 15, 1999.

David F. Williams, Seth Shapiro, Cadwalader, Wickersham & Taft, Washington, DC, for plaintiff.

Janet M. Nesse, Darrell W. Clark, Morrison & Hecker L.L.P., Washington, DC, for debtor.

Steven L. Greenfeld, Gins & Greenfeld P.C., Washington, DC, for PWA, Inc.

John Freeman, Jan Freeman, trustees.

Peter A. Greenburg, Greenburg & Green, P.A., Rockville, MD, for Joseph D. Dreyfuss.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This decision holds that two $2,325,000 promissory notes should be classified as

equity instead of as debt. The promissory notes were issued by the debtor, Georgetown Building Associates, Limited Partnership ("GBA"), to its controlling partners, Joseph D. Dreyfuss, II, and Joseph R. Schuble, who sold them to defendants PWA, Inc. ("PWA") and Security Trust at a pittance in comparison to the amounts owed on the notes. The plaintiff, Citicorp Real Estate, Inc. ("Citicorp"), is engaged in a battle with GBA regarding confirmation of GBA's proposed plan and in this adversary proceeding seeks to limit the rights of PWA and Security Trust under the notes.[1] Citicorp first claims that the notes should be characterized as equity instead of debt, such that they are not claims in the case. Citicorp claims alternatively that if the notes are characterized as debt and hence constitute claims in the case, the obligations nevertheless are subject to equitable or contractual subordination behind Citicorp's claims.

The defendants, GBA, PWA, and Security Trust, contend that PWA and Security Trust were holders in due course of notes that on their face were debt instruments, so as to be immune from the court's characterizing the notes as equity instead of debt, and immune from equitable or contractual subordination to Citicorp's claims. They contend alternatively that the notes represent genuine debt, not equity, and that the debts are not subject to equitable or contractual subordination.

The court holds that the notes represent equity, not debt. The court holds that the status of being a holder in due course under nonbankruptcy law is ineffective to protect the notes from characterization as equity if the notes represented equity instead of debt. The court finds it unnecessary to resolve whether PWA and Security Trust were in fact holders in due course

and whether their claims are subject to equitable or contractual subordination.

## I

A brief chronology of major events and a summary of the court's reasoning is warranted.

Dreyfuss and Schuble are brothers-in-law, close friends, and long-standing partners in many real estate partnerships. GBA is a partnership formed in 1986 to operate an office building on land leased from ground lessors. Dreyfuss, Schuble, and Richard M. Aronoff were the principal general partners. Citicorp lent GBA $12.5 million upon its formation, with the partners guaranteeing $3.5 million of the loan which was otherwise nonrecourse. In September 1990, Dreyfuss and Schuble advanced GBA $250,000 ($125,000 each), commencing the series of advances to GBA aggregating $4.65 million represented by the two notes at issue in this proceeding.

In March 1991, Citicorp's loan matured. Citicorp and the debtor entered into negotiations regarding a restructured loan. Simultaneously, GBA's partners enter into negotiations regarding amending the GBA partnership agreement to enhance the rights of Dreyfuss and Schuble as partners in the economic future of the debtor. In September, October, and December of 1991, Dreyfuss and Schuble advanced GBA a total of $650,000 ($325,000 each).

In January 1992, the parties restructured the Citicorp loan, extending its maturity to 1993. Dreyfuss and Schuble advanced $3.5 million to GBA ($1.75 million each) to be devoted to Citicorp's loan and to relieve the partners of their guarantee of $3.5 million of the loan. Simultaneously, the GBA partners amended their partnership agreement to tilt the financial advantages in favor of Dreyfuss and Schuble.

---

1.  Citicorp holds an allowed secured claim of approximately $8.6 million, secured by GBA's real property and rents, and an allowed unsecured claim of approximately $2.2 million. Citicorp will succeed in defeating the debtor's proposed plan if PWA and Security Trust are not allowed to vote on the plan on the basis that they are not creditors. The debtor's plan may also be more difficult to confirm if Citicorp succeeds in subordinating the notes of PWA and Security Trust even if they are held to be claims.

For example, the agreement was amended to allocate the bulk of operating losses and any gain to Dreyfuss and Schuble; to treat the prior advances by Dreyfuss and Schuble as capital contributions in order to enhance the propriety of the bulk of GBA's operating losses being allocated to them; to give Dreyfuss and Schuble a 10% preferred return on their capital contributions; and to give them a $6 million preferential distribution on the sale of the property.

In April 1993, Dreyfuss and Schuble advanced an additional $150,000 to GBA ($75,000 each), completing the series of advances leading to the $4.65 million in notes.

In 1993, Dreyfuss, Schuble, and GBA filed 1992 income tax returns which treated the unpaid advances made in 1992, and (for the first time) the unpaid advances from earlier years, as capital contributions.

Then in December 1993, the Citicorp loan modification was amended, with the loan's maturity extended to December 1996. This amendment permitted GBA to make certain payments on advances that Dreyfuss and Schuble had made to GBA, with Dreyfuss characterizing the advances as debt in the agreement, without disclosing that GBA and its partners had just recently filed tax returns for 1992 characterizing the advances as capital contributions. Citicorp was not advised that the advances had been characterized by the January 1992 amendment of the partnership agreement as capital contributions; it did not bargain for reclassifying them as debt, and simply accepted Dreyfuss's representations. Under the 1993 amendment of the loan modification, Dreyfuss Brothers, Inc. was installed as a receiver, apparently to assure that Citicorp's interest in rents was perfected.

On February 2, 1994, GBA issued the notes at issue here for $2,325,000 each to Dreyfuss and Schuble to cover all of the prior unpaid advances. Some of those advances had been covered by prior notes, but others had not been.

From 1994 through 1997, GBA, Dreyfuss, and Schuble filed tax returns for the years 1993 through 1996 which treated the $4.65 million in advances as capital contributions. The returns and Schedules K–1 for the taxable years 1994 and 1996 treated payments on the two $2,325,000 notes as returns on capital.

In 1996, GBA, Dreyfuss, and Schuble's accounting firm began exploring the possibility of Dreyfuss and Schuble taking a "bad debt" deduction for advances made to GBA.

On December 31, 1996, the Citicorp loan matured with $9,325,000 owed.

On November 26, 1997, Dreyfuss and Schuble sold the two $2,325,000 notes to PWA and Security Trust.

On December 1, 1997, five days after the sale of the notes, GBA filed its bankruptcy case, staying Citicorp from selling GBA's real property at a foreclosure sale which had been set for later that month.

In 1998, after GBA filed its bankruptcy case and reorganization purposes motivated GBA to argue that the advances were debt, Dreyfuss, Schuble, and GBA filed income tax returns for 1997 changing the previous treatment of the advances as capital contributions. Instead, the returns treated the advances as debt, with Dreyfuss and Schuble taking a large capital loss, something they could not accomplish if the advances were treated as capital contributions.

In a nutshell, the facts demonstrate that the advances by Dreyfuss and Schuble were capital contributions, not debt. The January 1992 amendment of the partnership agreement clearly reflects the contemplation of GBA and its partners that the advances made by Dreyfuss and Schuble would be treated as capital contributions. Nothing occurred before or afterwards to justify treating the advances as debt instead of as capital contributions: the evidence is overwhelming that the intention of the partnership was to treat

these as capital contributions. Nor have the defendants established any basis for estopping Citicorp from asserting that the advances were not debt. Finally, the contention that Security Trust and PWA were holders in due course is insufficient as a matter of law to convert the obligations reflected by the promissory notes from capital contributions into debt.

## II

■ Although the foregoing summary of the facts would be sufficient for purposes of this decision, the court will examine the thicket of facts to more fully justify its rejection of the defendants' factual contentions.

### A. General Background of GBA and the Citicorp Loan

GBA was formed on March 6, 1986, as a limited partnership under D.C.Code Ann. § 41–201, et seq. (1981), by a Limited Partnership Agreement and Certificate of Limited Partnership. This Partnership Agreement was twice later amended, with the last amendment in 1992 being of particular importance to the debt-versus-equity issue. The Partnership Agreement (§ 5(A)) named five general partners: Dreyfuss, Schuble, Aronoff, Harry H. Nick, and William L. Remley. Dreyfuss and Schuble each had a 28.33–1/3% interest in the partnership; Aronoff held a 27.33–1/3% interest.[2] The remaining general partners, Nick and Remley, each had a 7.5% interest. Kurt D. Winterkorn, a limited partner, had a 1% interest.

The business of the partnership was the acquisition and operation of a five-story office building, including ground floor retail space and an underground garage, located at 2233 Wisconsin Avenue, N.W., Washington, D.C. Technically, the building itself was not acquired but instead a long-term ground lease with ground lessors.

The partners initially agreed that no capital contributions would be required. Instead, the partnership would borrow up to $14 million, with each general partner required to guarantee the loans to the extent required by the lender, but with Nick and Remley entitled to indemnification by the other general partners.[3]

Citicorp lent GBA $12.5 million on March 6, 1986, on a nonrecourse basis as the entire initial funding of the partnership. The note was guaranteed by the general partners in an amount capped at $3.5 million. The note was secured, pursuant to a deed of trust, by GBA's building—by its leasehold interest under the ground lease and the improvements thereon—and, pursuant to an assignment of rents, by the building's rents.

In addition, GBA borrowed $1.4 million or more from Sovran National Bank on a recourse basis[4] to make up for the shortfall in funds obtained from Citicorp versus the approximately $14 million which had been thought would be necessary to acquire the building and commence operations.

---

2. For each of these figures, 3.33–1/3% represented a one-third share of a 10% limited partner interest reserved for additional limited partners that was allocated one-third each to Aronoff, Dreyfuss and Schuble until such time as additional limited partners were admitted to the partnership. Under § 5(B), the Agreement contemplated a May 1, 1986, deadline for amending the Agreement to state another owner for the reserved interest, with Aronoff, Dreyfuss and Schuble thereafter to own their one-third share of the reserved 10% interest if no new owner was designated by then. No additional limited partners were admitted.

3. Nick and Remley were only entitled to indemnification for amounts in excess of cash distributions they might receive from GBA. Partnership Agreement § 6(A)(later deleted and replaced in 1992 after the Citicorp guarantee had been extinguished).

4. The record is unclear regarding the precise date and initial amount of the Sovran loan. Its balance in 1991 was $1.4 million. Citicorp Ex. No. 55.

Initially Aronoff Management Company acted as the building's day-to-day manager. But at the end of 1987, Dreyfuss Brothers, Inc., of which Dreyfuss and Schuble are shareholders, took over that management. Schuble deferred to Dreyfuss's judgment, based on Dreyfuss's expertise in commercial real estate, when it came to close calls regarding GBA.

From 1988 through 1991, GBA encountered unanticipated difficulties with the building, including spending $200,000 to $300,000 on asbestos removal; $180,000 to $250,000 on new air conditioner chillers; and a part of $800,000 to $900,000 incurred through 1992 for litigation expenses with respect to the ground lease. The ground lease litigation concerned a provision of the ground lease requiring that the rent be adjusted based on a revaluation of the ground every ten years.

### B. The Two $2,325,000 Promissory Notes

The defendants contend that the advances were in actuality loans, not capital contributions, as evidenced by promissory notes prepared and issued by Dreyfuss (on behalf of GBA) to himself and Schuble, as well as a note receivable log Dreyfuss maintained for himself. But as will be seen, a 1992 amendment of the partnership agreement and subsequent tax returns for 1992 through 1996 classified the advances as capital contributions, with the financial benefits of GBA shifted almost exclusively to Dreyfuss and Schuble in exchange for the contributions. Although unnecessary (because the partners' intention is so overwhelmingly clear from the 1992 amendment and the tax returns that these were capital contributions), the court nevertheless will examine the circumstances surrounding the notes as additionally relevant to the question of debt versus equity. It becomes evident that after the 1992 amendment, the notes became little more than markers reflecting how much Drey-

fuss and Schuble had infused into the debtor as capital contributions.[5] They furnish practically no support for the contention that the advances were loans.

The two $2,325,000 promissory notes purchased by PWA and Security Trust were issued on February 2, 1994. They represented advances by Dreyfuss and Schuble over the period of September 1990 through April 1993. The 1994 notes were, in part, replacement notes superseding prior notes representing part of the prior advances. Those earlier promissory notes preceded the advancing of the amounts at issue here by months and, in most instances, by years. As will be seen in § D below, the 1994 notes themselves were issued after Dreyfuss had misrepresented to Citicorp, in negotiating the December 1993 amendment of the Citicorp loan modification, that the advances represented indebtedness of GBA to himself and Dreyfuss, and after he had thus realized that no note existed that could be attributed to $2 million of the 1992 advances.

Of some relevance to the debt-versus-equity question is the lack of formalities regarding the issuance of the prior notes and the replacement notes; the characteristics of the notes; the informal way in which the notes were handled; and so forth. In addition, the purposes of the advances and the debtor's financial condition when the advances were made suggest that these advances were in the nature of capital contributions.

From September 1990 to April 1993, Dreyfuss and Schuble each advanced the debtor $2,325,000, either directly or indirectly, by way of payments to Citicorp on GBA's behalf, for an aggregate of $4.65 million. No other partner was lending the debtor money. Each of the advances was made by Dreyfuss and Schuble at roughly the same time after they consulted with each other and agreed to make the ad-

---

5. Dreyfuss had started maintaining the note receivable ledger prior to January 1992. It is evident that Dreyfuss continued to maintain the ledger simply as a marker of the amounts placed into GBA and repayments of those advances.

vance. The specific checks were as follows:

| Date | Payor | Payee | Amount | Notation on Check |
|------|-------|-------|--------|-------------------|
| 9/21/90 | Schuble | GBA | $ 125,000 | Loan |
| 9/25/90 | Dreyfuss | GBA | 125,000 | Loan |
| 9/26/91 | Schuble | GBA | 125,000 | Loan to Partnership |
| 9/27/91 | Dreyfuss | GBA | 125,000 | Loan to Partnership |
| 10/29/91 | Schuble | GBA | 200,000 | Loan |
| 10/29/91 | Dreyfuss | GBA | 200,000 | Loan |
| 12/13/91 | Schuble | GBA | 50,000 | 2 Mos. Curtail—Sovran |
| 12/23/91 | Dreyfuss | GBA | 50,000 | Curtail—[illegible] Loan |
| 1/1/92 | Schuble | Citicorp | 500,000 | Collateral For Geo. Bldg. Loan [illegible] |
| 1/13/92 | Dreyfuss | Citicorp | 500,000 | 2233 Wisc. Ave. Cash Collateral |
| 1/1/92 | Schuble | Citicorp | 1,250,000 | Georgetown Bldg. Loan Curtail |
| 1/13/92 | Dreyfuss | Citicorp | 1,250,000 | 2233 Wis. Ave. Loan Curtail |
| 4/27/93 | Schuble | GBA | 75,000 | Loan |
| 4/27/93 | Dreyfuss | GBA | 75,000 | Loan |
| TOTAL: | | | $4,650,000 | |

*Lack of Formalities; Expectation re Repayment; Lending Against Matured Notes.* Until February 2, 1994, no note was issued with respect to $2 million of the advances that were outstanding after January 13, 1992. It was on February 2, 1994, that the debtor issued promissory notes to Dreyfuss and Schuble, each for $2,325,000, superseding all prior notes. Each $2,325,000 note covered the payee's $1 million share of the $2 million of advances for which no note had ever been issued, as well as all other unpaid advances for which there had been notes. The notes were payable on demand with interest at the rate of 1% over prime per annum.

The prior notes, aggregating $2.65 million ($2 million shy of the $4.65 million aggregate amount of the 1994 notes) were payable as follows:

| Date | Amount | Maturity | Payee | Interest Rate |
|------|--------|----------|-------|---------------|
| 10/20/87 | $ 500,000 | 10/31/90 | Joint | 1% over Prime adjusted annually |
| 04/05/89 | $1,000,000 | 04/30/90 | Joint | 13.5% per annum |
| 09/15/90 | $1,000,000 | 09/30/91 | Joint | 15% per annum |
| 04/27/93 | $ 75,000 | On demand | Dreyfuss | Prime + 4% per annum |
| 04/27/93 | $ 75,000 | On demand | Schuble | Prime + 4% per annum |

No interest was ever paid on any of these notes with respect to the advances whose debt-versus-equity character is at issue here.[6] When the replacement notes

6. Although $560,000 was advanced by Dreyfuss and Schuble in 1987 through 1988 under these notes, those advances, including interest accruals, were paid off in September 1989. Another $100,000 temporarily advanced in January 1990 was paid off in February 1990.

were issued in 1994, each note included only principal. All of the interest that had accrued on the prior notes simply disappeared without explanation.[7] No record was created to document this forgiveness of supposed interest debt. Nor was any income reported by the debtor as the result of such forgiveness of supposed interest debt. Finally, GBA, Dreyfuss, and Schuble did not maintain records showing how much of funds advanced to the debtor were attributable to a particular note. Dreyfuss's ledger does not list notes; it only lists amounts advanced and amounts repaid with no tie-in to a particular note. All of these irregularities suggest that the notes—particularly with respect to the funds advanced after the notes matured—were viewed as little more than bookkeeping devices to permit Dreyfuss and Schuble to keep track of their advances to the debtor, a matter of some importance because they would need to keep track of the advances as capital contributions affecting their distribution rights as partners.

The first advance at issue is the September 1990 advance of $250,000. According to Dreyfuss, this was treated as an advance under the October 1987 note. It appears more likely, and the court finds, that the September 1990 note was issued to cover the September 1990 advance.[8] There would have been no reason to issue the September 1990 note unless it was for the purpose of covering funds which Drey-

fuss contemplated would shortly be advanced. In the December 1993 amendment to the 1992 loan modification, Dreyfuss represented to Citicorp that there were notes outstanding and he listed the October 1987 note and the September 1990 note as amongst them. It is apparent that he was simply trying to maximize the size of alleged debt for which notes were allegedly outstanding by treating the September 1990 advance as made against the October 1987 note instead of the September 1990 note: this permitted the September 1990 note to be dedicated instead to other advances for which no note was ever actually issued. Eventually, as part of the 1992 amendment of the partnership agreement, the September 1990 advance was reclassified by Dreyfuss, Schuble, and GBA as a capital contribution instead of debt.

The Citicorp loan matured in March 1991. In the course of initial discussions regarding restructuring the Citicorp loan, Dreyfuss and Schuble wrote to Citicorp in April 1991 referring to "capital contributions" they had made that had enhanced the value of the building, which would include the September 1990 advance.[9]

Then Dreyfuss and Schuble made the September, October and December 1991 advances of, respectively, $250,000, $400,000, and $100,000. According to Dreyfuss, the September 1991 advance was treated as an advance under the matured October

---

The character of the advances pre-dating September 1990 are not at issue in this proceeding.

7. In addition, one might expect that the interest rate originally charged would continue to be charged on a loan when a replacement note was issued, or that there would be some recital explaining the parties' agreement to restructure the loan at a different interest rate. But the court places no weight on this aspect of the transactions: the parties to a note are free to agree to a new interest rate as they see fit.

8. There is nothing unusual about treatment of the September 1990 advance as an advance not made simultaneously with the issuance of

the note to which it relates: banks apparently receive promissory notes against which the bank advances the full amount of the funds in later stages, or, before maturity, may advance new funds after earlier advances have been paid down.

9. The letter referred to $1.77 million of such capital contributions. This apparently included the funds obtained via the Sovran loan for which the partners had recourse liability plus amounts that had been advanced to the debtor even if repaid. The point is that whatever amounts, besides the Citicorp loan, Dreyfuss and Schuble had put into the partnership— either directly or via incurring recourse liability to Sovran—were viewed as capital contributions.

1987 note;[10] the October 1991 advance was treated as an advance under the matured April 1989 note;[11] and the December 1991 advance was treated as an advance under the same matured April 1989 note.[12] It is more likely that Dreyfuss simply did not believe that a note was necessary because the advances were going to be treated as capital contributions. The September, October, and December 1991 advances were simply viewed as capital contributions in light of ongoing negotiations amongst the partners that, in tandem with the restructuring of the Citicorp loan (including a forthcoming $3.5 million curtailment by Dreyfuss and Schuble), would treat all advances by Dreyfuss and Schuble as capital contributions. Those negotiations eventually led to the January 1992 amendment of the partnership agreement.

In favor of treating the 1990 and 1991 advances as loans, however, are the income tax returns filed by GBA and the partners for the years 1990 and 1991 which treated the advances as loans. With the exception of the postpetition returns for 1998, the returns for later years recognized that the 1992 amendment of the partnership agreement required that these advances aggregating $500,000 be treated as capital contributions and undid the prior years' returns' classification of the advances. The 1992 and 1993 advances aggregating $3.65 million were consistently treated as capital contributions on income tax returns for years prior to 1998.

Let us assume for the moment that Dreyfuss's recollection was accurate that he treated these September, October, and December 1991 advances as made under

matured notes. That raises the obvious question of when Dreyfuss expected the notes to be repaid. Dreyfuss's expectation of repayment was indefinite, depending on the success of the debtor. He viewed the likelihood of repayment as so remote that he did not include this advance (or any other part of the $4.5 million in advances made through January 1992) on his financial statement issued in December 1993.

Then the January 1992 advance of $3.5 million was made. According to Dreyfuss, $500,000 of this was treated as advanced under the matured April 1989 note, and $1 million was treated as advanced under the matured September 1990 note. Again, the court rejects this testimony in light of the amendment to the partnership agreement which was occurring simultaneously and which treated all of the advances as capital contributions. Moreover, no note existed that could cover $2 million of the $3.5 million advance. In any event, even if the testimony were an accurate recollection of events, Dreyfuss once again was looking to the availability of cash in GBA to repay, something depending on the future success of GBA.

Then the April 1993 advance of $150,000 was made. This advance ($75,000 by each of the two partners) was made pursuant to the April 1993 notes, which is some evidence that the advance was intended to be treated as a loan. That evidence is outweighed, however, by GBA's failure to treat the advance as a loan. Instead, it treated the advances as capital contributions, with the consequence of Dreyfuss and Schuble having enhanced rights against the other partners in the fruits of the debtor pursuant to the partnership agreement.[13]

---

**10.** The September 1990 note for $1 million did not mature until September 30, 1991. But to be consistent with his treatment of the September 1990 note as discussed above, Dreyfuss would have to treat any amounts advanced in September 1991 as advanced first to the earliest issued note until advances outstanding equaled the face amount of the note. The testimony is not credible because it makes no sense that advances would be treat-

ed as made under a matured note when the September 1990 note had not yet matured.

**11.** In any event, no note was outstanding which had not already matured.

**12.** Again, no note was outstanding which had not already matured.

**13.** See the discussion, below, regarding the January 1992 amendment of the partnership agreement.

Finally, in February 1994, GBA issued the two $2,325,000 notes, replacing all of the prior notes and, for the first time, covering that $2 million portion of the $3.5 million Citicorp loan curtailment which GBA's matured notes had been insufficient to cover. This occurred only after Dreyfuss misrepresented to Citicorp in 1993 that the advances represented indebtedness and realized that no note existed that could cover the $2 million. The 1994 notes were unsecured demand notes with no stated maturity date, no sinking fund, and no schedule of interest payments. The notes were never recorded in GBA's books and records. Neither Dreyfuss nor Schuble ever made a demand for payment of the 1994 notes. The GBA partners entered into no agreement upon the issuance of the 1994 notes to treat the advances covered by the notes as debt instead of equity.

*Purposes of the Advances.* The purposes of the advances are consistent with treating them as capital contributions. The January 1992 payments by Dreyfuss and Schuble to Citicorp were used to curtail the loan or to set up a cash collateral account as additional security for the original Citicorp loan. These sums equaled $3.5 million and as part of a January 1992 agreement extinguished the partners' partial guarantee of $3.5 million of million of GBA's debt to Citicorp. So more than 75% of the advances were for an extinguishment of a guarantee of the acquisition debt owed Citicorp. GBA had been unable through its own resources to pay off the cost of acquiring its property. The guarantee was paid off, with the consequence that Dreyfuss and Schuble effectively had advanced $3.5 million of the acquisition cost.

When the $3.5 million curtailment was made, the debtor could not have obtained financing from an outside commercial lender. GBA was a party to a ground lease that called for adjustment of the ground rent every ten years; the property was burdened by environmental problems, including asbestos; GBA had had problems leasing the property to tenants; and the ground lease was unsubordinated. Not only were the advances of a speculative nature, but additionally, Dreyfuss and Schuble, as a result of these and their other advances, were given preferred rights within the partnership, as against other partners, with respect to the future fruits of the endeavor. Thus, the $3.5 million advanced was in the nature of an investment in the debtor's future performance. The $3.5 million was an equity contribution, not a loan.

Similarly, $900,000 of the remaining $1.15 million of the $4.65 million in advances represented by the two $2.325 million notes was for the purpose of curtailing the existing Sovran loan.[14] The partners were liable for the Sovran loan as a recourse loan, and it had been used to meet the shortfall at the time of acquisition of the property. As in the case of the $3.5 million curtailment of the Citicorp guarantee, the advances of $900,000 to curtail the Sovran loan were made when the debtor's prospects were uncertain, after the debtor's own resources had proven insufficient to pay the loan, and in light of a forthcoming or completed January 1992 amendment of the partnership agreement enhancing the rights of Dreyfuss and Schuble as partners in the fruits of the debtor's future. Thus, the $750,000 advanced in 1991 was in the nature of an investment in the debtor's future performance—an equity contribution, not a loan.

The remaining $250,000 of the $4.65 million presents a slightly closer question.

14. First, the 1991 advances aggregating $750,000 were used to curtail the Sovran loan. Second, the April 1993 advances aggregating $150,000 appear to have been used to pay off the Sovran note which had a $150,000 balance outstanding at the end of 1992. GBA had no records which could identify the purpose of the April 1993 advances, and Dreyfuss could not recall the purpose of the payment, but the amount matches the Sovran note balance and, by the end of 1993, the debtor's books reflected that no debt was owed Sovran.

This amount was for miscellaneous expenses such as the ground lease litigation and capital expenses, made when the debtor's economic future was uncertain. The circumstances suggest that these advances were more in the nature of capital contributions than loans. For example, Dreyfuss and Schuble were hoping to win the ground lease litigation and get a significant reduction in ground rent. Ultimately the ground rent was set higher than GBA advocated, but lower than the ground lessors advocated. The advances represented more an investment in the debtor's future—a capital contribution—than a loan with an expectation of repayment at a fixed date.

### C. The January 1992 Citicorp Loan Modification and Partnership Agreement Modification

The debtor defaulted in repaying the loan upon its maturity on March 5, 1991.[15] Pursuant to a Loan Modification and Settlement Agreement dated January 13, 1992, the loan's maturity date was extended to March 6, 1993, in exchange for a loan curtailment of $2.5 million, the creation of a cash collateral account of $1 million as additional collateral for the loan, and the appointment of Dreyfuss Brothers, Inc. as receiver for the collection of rents in favor of Citicorp in connection with the assignment of rents. Additionally, the agreement extinguished the partners' guarantee of $3.5 million of the Citicorp loan. Dreyfuss and Schuble executed a new guarantee of only GBA's operating deficits and interest on the Citicorp loan.

Simultaneously, the GBA partners executed an amendment of the partnership agreement dated January 24, 1992, an amendment whose preparation had been completed on December 18, 1991, in anticipation of the Citicorp loan modification, and whose execution was a condition to Dreyfuss and Schuble proceeding with the Citicorp loan modification. The amendment recognized that Dreyfuss and Schuble "have made certain additional capital contributions to the partnership" (meaning the $4.5 million they had advanced to GBA commencing in September 1990), and on that basis tilted the financial benefits of the partnership to Dreyfuss and Schuble. For example, as amended, the partnership agreement called for proceeds of any sale of GBA's property to be distributed first towards a "Net Preferred Return" of 10% per annum on all past and future capital contributions (§§ 14.D(2)(c) and 14.F(1)); [16] then to any partner on account of any "Excess Partnership Capital" (meaning the amount by which a partner's percentage of capital contributions exceeded the partner's stated percentage of partnership interests in the partnership)(§§ 14.D(2)(d) and 14.F(2)); [17] and then towards a "Priority Return" of $6 million to Dreyfuss and Schuble (§ 14.D(2)(e)).[18] As amended, § 14.C of the agreement similarly tilted the distribution of GBA's net cash flow to Dreyfuss and Schuble as the only partners who had made (and would ever make) capital contributions to GBA. Dreyfuss viewed the Priority Return on a sale of the property as affording "windfall protection" for him and Schuble. The agreement additionally installed two partnerships controlled by Dreyfuss and Schuble as the sole general partners in light of substantial asbestos and other environmental issues that could give rise to claims against the general partners.

---

**15.** The Citicorp note required that monthly interest only be paid until maturity on March 5, 1988. But the maturity date could be extended for three additional twelve month periods at the election of GBA, provided that certain conditions were met. The maturity date was extended until March 5, 1991, with the conditions for extension either met by the debtor or waived by Citicorp.

**16.** Amendment §§ 25 and 31.

**17.** Id.

**18.** Id. § 25.

The 1992 amendment was motivated in part by Dreyfuss and Schuble's desire to have GBA's losses allocated to them for tax purposes. The 1992 amendment gave them 99% of the losses, with the general partners (whom they controlled) receiving the remaining 1%.[19] By reclassifying the 1990 and 1991 advances as capital contributions and treating the 1992 advances and future advances as capital contributions, they concluded, on the advice of accountants and attorneys, that they could justify GBA's allocating the losses to them (whereas they could not as safely justify such treatment if the advances were treated by GBA as loans). Although, after the amendment, Aronoff was still responsible for one-third of the capital contributions, it was highly unlikely that he would ever be able to cover that responsibility.

### D. The December 1993 Amendment to the Loan Modification

In March 1993, GBA once again defaulted on the Citicorp loan. New loan restructuring negotiations ensued. On December 23, 1993, the parties entered into a First Amendment to Loan Modification and Settlement Agreement which extended the maturity of the loan to December 31, 1996.[20] This amendment included an Equity Requirement which called for GBA's partners to fund, not later than July 1, 1994, an Equity Contribution of no less than $500,000 to GBA to be used by GBA only for certain capital expenditures, tenant improvements, leasing commissions, and other specified costs of the property. Upon the full funding of the Equity Con-

tribution, none of GBA's funds could be distributed to the partners

except to the extent of (i) debt service on certain indebtedness owed by Borrower [GBA] to certain of its partners as correctly and accurately scheduled on *Exhibit B* hereto, at the lesser of (A) the per annum rate of interest announced from time to time by Citibank, N.A. as its "prime rate" ... plus one percent (1%), or (B) the contract rate therefor as set forth in *Exhibit B*, and (ii) a return on the Equity Requirement not to exceed ten percent (10%) per annum.

Exhibit B to the agreement listed the $2.65 million of notes payable by GBA to Schuble and Dreyfuss, plus the $2 million paid to Citicorp on January 13, 1992, for which they had no note.[21] As Dreyfuss explained, he wanted to be sure that payments on the advances could be made to him and Schuble as a first distribution from the partnership pursuant to the partnership agreement. Phyllis Caldwell, a Citicorp loan officer, principally negotiated the December 1993 agreement on behalf of Citicorp. It was Dreyfuss who characterized the sums listed on Exhibit B as "indebtedness," and Caldwell accepted his characterization for purposes of closing the deal. Neither she nor anyone else at Citicorp undertook an investigation to determine if the amounts represented by Exhibit B constituted loans or capital contributions. The key for Citicorp was not the label Dreyfuss placed on the advances, but rather giving the partners an incentive to make the Equity Contribution. Citicorp was prepared to allow Dreyfuss and Schu-

19. Before the amendment, losses were allocated equally to Aronoff, Dreyfuss, and Schuble. After the amendment, the two new partnership general partners were allocated 0.5% each of the losses and Dreyfuss and Schuble were equally allocated the remaining 99% of the losses. *See* Agreement (as amended) §§ 7.A(2)(losses other than on a disposition of all of GBA's property); 7.B(ii)(losses on a disposition); 7.G (carve out of 1% of losses for general partners).

20. The agreement bifurcated the $10 million principal amount still owed Citicorp into two

separate notes for $7 million and $3 million, respectively, each with a maturity date of December 31, 1996, and with provisions for forgiving part of the larger note if early repayment were made of the larger note, the amount of forgiveness depending on how soon the larger note was paid.

21. The quoted provision forms the basis for Citicorp's claim seeking contractual subordination of the advances in the event that they are held to be debts. The court does not reach that claim.

ble to take limited amounts of money out of the partnership after July 1, 1994, as a concession to get the borrower to put more money in. Caldwell advised Dreyfuss that by regulation Citicorp could not allow GBA's partners to take out equity, and could only allow GBA to pay interest. She relied on Dreyfuss's representations regarding what loans had been made to GBA. There was no discussion of these amounts having been classified as capital contributions: Citicorp was not asked to consent to a reclassification of the capital contributions as debt. Although the 1992 amendment of the partnership agreement was supplied to Citicorp, it was not supplied for the purpose of revealing that the advances were capital contributions.[22] There is simply no evidence that Citicorp was aware that these advances were capital contributions.

### E. Treatment of the Advances on Tax Returns and GBA's Records

For the taxable years 1992 (the year the partnership agreement was amended) through 1997 (the year of the filing of GBA's voluntary bankruptcy petition), the $4.65 million in advances at issue here were treated on income tax returns of GBA, Dreyfuss, and Schuble, and on GBA's accounting records, as contributions to capital. Even 1994 and 1996 payments by GBA on the advances were treated as distributions (on account of capital contributions) and not as partial repayment of debt. Dreyfuss recorded these payments on his ledger as principal repayments, not as payments of interest. The ledger is entitled a "Note Receivable" ledger, but it was maintained to keep track of advances even after they had all been definitively

reclassified as capital contributions in January 1992. The ledger was little more than a bookkeeping device to keep track of advances. It is entitled to almost no weight in determining whether the advances should now be treated as debt.

Beginning in March 1996, when Dreyfuss and Schuble realized that GBA's prospects for survival (meaning avoiding foreclosure) were uncertain, they began exploring the possibility of treating the advances as a bad debt, which would give rise to an income tax deduction, instead of as capital contributions for which no deduction would be available. Ultimately they settled upon the tactic of selling the notes for a pittance to PWA and Security Trust in 1998, and treating the loss as a capital loss on their income tax returns for 1998, a course that their accountants advised would less likely give rise to challenge by the Internal Revenue Service, and which would avoid the necessity of being able to prove when the obligation became worthless.

### F. The Sale of the 1994 Notes to PWA and Security Trust

On November 26, 1997, the two 1994 notes were sold to PWA and Security Trust for $15,000 each—a 99.5% discount off their face value. John Freeman, a client of Dreyfuss Brothers, Inc., negotiated the sale on behalf of PWA and Security Trust (PWA being his wholly owned corporation and Security Trust a trust for his mother). Freeman is a sophisticated real estate investor and was aware of the difference between debt and equity. Freeman made no inquiry regarding how the notes were classified on the tax returns and other books and records of GBA,

---

**22.** Dreyfuss supplied Citicorp's counsel a copy of the 1992 agreement amending the partnership agreement to make it clear that repayment of the notes was the first priority in the partnership agreement. Sections 14C.1 and 14D.2(b) of the partnership agreement (as amended) indeed did provide that loans by partners were to be repaid first, but they would not have revealed to Citicorp that the advances had been classified as capital contributions instead of as loans. The partnership agreement, as amended, never specified how much Dreyfuss and Schuble had advanced to GBA that was being treated as capital contributions. Although Dreyfuss perceived these provisions in 1993 as applying to the advances, they only deal with loans under section 6A of the partnership agreement, which, Dreyfuss now concedes, was limited to amounts loaned after January 24, 1992.

Dreyfuss, and Schuble; he did not even examine the notes before the sale was concluded. Instead, Freeman insisted upon and received a Negotiation and Transfer Agreement requiring Dreyfuss and Schuble to indemnify PWA and Security Trust for all fees and expenses incurred in defending their status as holders in due course and as creditors of GBA. Dreyfuss and Schuble warranted that the notes represented "obligation of Georgetown to Dreyfuss for sums advanced to, or paid on behalf of, Georgetown by Dreyfuss," with the right to rescind the purchase if the warranty proved untrue.

Freeman was aware that the property was encumbered by Citicorp's loan and that the notes represented a high risk depending on the uncertain outcome of any workout with Citicorp or of a bankruptcy filing by GBA, with any foreclosure by Citicorp certain to render the notes worthless. He was also aware of Dreyfuss and Schuble's desire to sell the notes and claim a tax loss on the sale.

### III

The evidence is overwhelming that the two 1994 notes totaling $4.65 million represented equity contributions, not debt. The notes thus will be classified as interests in the debtor, as that term is used in the Bankruptcy Code, instead of as claims.

Although GBA reclassified the $4.65 million in advances as debt in 1998 when it filed its 1997 income tax return, that reclassification cannot undo the true character of the advances. Under the 1992 amendment to the partnership agreement, the advances were treated as capital contributions. That characterization was consistent with the tilting of tax losses and of the partnership's economic benefits to the only two partners (Dreyfuss and Schuble) who had made the advances. If the advances were loans, there would have been no justification for tilting GBA's financial benefits almost exclusively to Dreyfuss and Schuble.

Authority to treat the advances as equity interests arising from capital contributions, and not debt, despite the issuance of promissory notes is well supported by the case law. *See, e.g., In re Cold Harbor Assocs., L.P.,* 204 B.R. 904, 915 (Bankr. E.D.Va.1997); 4 COLLIER ON BANKRUPTCY ¶ 510.05 (15th ed. Rev.1998). This is not an exercise in equitable subordination. In *Unsecured Creditors' Committees v. Pioneer Commercial Funding Corporation (In re Pacific Express, Inc.),* 69 B.R. 112, 115 (9th Cir. BAP 1986), the court held that the Code provisions regarding allowance and subordination of claims "do not provide for [subordination via] the characterization of claims as equity or debt." But that court missed this elemental point: if a particular advance is a capital contribution, it never becomes a claim. The debt-versus-equity inquiry is not an exercise in *recharacterizing* a claim, but of *characterizing* the advance's true character. If the advance is not a claim to begin with, then equitable subordination never comes into play. *See* Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 510(c) Equitable Subordination?,* 56 Wash. & Lee L.Rev. 689, 712–20 (1999)("Note")(criticizing *Pacific Express* ).

The court need not recite all of the various factors courts examine to determine whether advances are debt or equity. These advances were made with no fixed date for expecting repayment, with payment depending on the success of GBA, and with the partners intending to treat these as capital contributions under the 1992 amendment of the partnership agreement. The various factors (recited at length in *Cold Harbor* ) weigh overwhelmingly in favor of classifying these advances as capital contributions. If ever a case existed in which notes must be classified as capital contributions, this is it, regardless of what test may be used. *See* Note, 56 Wash. & Lee L.Rev. at 720 (suggesting that focus on undercapitalization alone would be inappropriate).

## IV

■ The defendants assert that PWA and Security Trust are holders in due course and that, on this basis, they are immune from the advances represented by the notes being characterized as capital contributions. This extraordinary contention would allow equity contributions to be converted into debt through the simple expedient of selling notes that were issued to represent the equity contributions. The court will not allow such legerdemain to convert what was a capital contribution into a debt obligation, transmuting what was pyrite into gold.

■ Even when holder in due course status is available, it does not bar a bankruptcy court from determining the true character of the obligation represented by the note. Under D.C. Uniform Commercial Code ("UCC")[23] § 3–305,[24] a holder in due course is only protected from certain *defenses* to the right to enforce the obligation to pay the instrument. That has nothing to do with the holder's rights (under its indisputable right to payment) as against creditors of the estate. Specifically, it has to do with defenses to payment, not the classification of the note as representing a debt or equity obligation (that is, an "interest" in the debtor, as that term is used in the Bankruptcy Code).

■ The classification of the obligation as a debt (liability on a claim) or an equity interest (referred to the Bankruptcy Code as simply an "interest" in the debtor) is not a "defense of the obligor" to the right to enforce payment of the notes under UCC § 3–305. Rather, it is simply a classification of the note obligations for purposes of participation in the bankruptcy case.

Although the term "interest" is not defined in the Bankruptcy Code, it is universally understood to mean an equity interest in the debtor. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 1412, 1424–25, 143 L.Ed.2d 607 (1999)(applying the term "interest" as contained in 11 U.S.C. § 1129(b)(2)(B)(ii)("retain under the plan on account of such ... interest any property")); *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). An equity interest is an ownership interest in the debtor with all of the rights to payment from the debtor's estate arising from equity contributions to the debtor. Thus, for purposes of confirmation of a plan, interests are treated as junior to claims. 11 U.S.C. § 1129(b)(2)(B) and (C). And 11 U.S.C. § 101(16) provides an illustration of

---

**23.** The UCC is subtitle I of title 28, D.C.Code Ann. (consisting of §§ 28:1–101 through 28:11–108 of that title).

**24.** UCC § 3–305 provides in pertinent part:

(a) Except as stated in subsection (b) of this section, the right to enforce the obligation of a party to pay an instrument is subject to the following:

(1) A *defense of the obligor* based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;

(2) A *defense of the obligor* stated in another section of this article or a defense of the obligor that would be available if the

person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and

(3) A claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.

(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1) of this section, but is not subject to *defenses of the obligor* stated in subsection (a)(2) of this section or claims in recoupment stated in subsection (a)(3) of this section against a person other than the holder.

[Emphases added.]

an interest: the term "equity security" is defined to include "interest of a limited partner in a limited partnership." That is precisely the "interest" status that Dreyfuss and Schuble occupied in being entitled to payments from GBA in exchange for their capital contributions. Their rights to payment were on account of "interests" in GBA, not claims.

Although 11 U.S.C. §§ 101(5) and 101(12) define "claim" as a right to payment and "debt" as liability on a claim, these definitions obviously do not include a right to payment based on an equity security or other interest in the debtor arising from capital contributions. That the interest in the debtor gives rise to a right to payment does not make that interest a claim.

The Bankruptcy Code contemplates that holders of equity interests are not entitled to participate as meaningfully in a bankruptcy case as are holders of claims for debts owed.[25] It is incumbent upon the bankruptcy court to make a determination in the case whether a particular obligation is an equity interest obligation or instead a debt obligation. The classification of obligations as debt or equity is not a defense to the obligation; it is simply a function of administering the relations between creditors and equity interest holders.

Although Citicorp argues that federal law is supreme and overrides any conflict with state holder in due course doctrine, there simply is no conflict here. That state law doctrine simply addresses the narrow question of defenses of the obligor to payment, not the question of the treatment accorded that right to payment in the bankruptcy case.

■ Thus, the holder in due course doctrine does not bar according secured status to a lien holder ahead of an unsecured note holder. Nor does the doctrine preclude contractual subordination or equitable subordination of the note holder as against creditors under 11 U.S.C. § 510(a) and (c).[26] Nor does the doctrine bar distribution to creditors entitled to priority under the distribution schemes of the Bankruptcy Code[27] prior to payment of the note holder. Nor, as here, does the doctrine preclude classification of the obligation, according to its true character, as debt or equity.

■ PWA and Security Trust, even if holders in due course, took the notes with all the infirmities (other than defenses to the right to payment) that they might suffer in a bankruptcy case. There was no guarantee under UCC § 3–305 that they might encounter creditors entitled to payment ahead of payment of their notes under the various rules of law—including the one applied here—which could be brought to bear in the bankruptcy case.

### V

The court bypasses the issue of whether PWA and Security Trust were not holders in due course based on notice or lack of good faith. Nevertheless, the court notes that Freeman (on behalf of PWA and Security Trust) never examined the notes; never asked for any GBA records evidencing these notes as loans made by Dreyfuss and Schuble; and, despite his sophistica-

**25.** Significantly for this bankruptcy case, a plan cannot be confirmed unless it is accepted by at least one class of claims; acceptance by a class of interests does not suffice. 11 U.S.C. § 1129(a)(10). By getting the 1994 notes classified as interests instead of claims, Citicorp will defeat the debtor's ability to have its proposed plan confirmed.

**26.** Contractual and equitable subordination apply only to claims, not to interests. If a note represents a claim against the debtor (instead of an interest in the debtor), then § 510 can be applied to the notes. If the note represents an interest instead, there is no need to invoke contractual or equitable subordination: the note obligation is already junior by virtue of being an interest.

**27.** *See, e.g.,* 11 U.S.C. § 726(a) (giving certain creditors a priority of distribution ahead of other creditors) in a chapter 7 liquidation case.

tion as a real estate entrepreneur and his understanding of the distinction between debt and equity, failed meaningfully to inquire whether these obligations were for capital contributions or loans. The transfer agreements only recite that the notes represent obligations for amounts advanced by Dreyfuss and Schuble. This illustrates the importance that the holder in due course doctrine not be expanded to bar a bankruptcy court's determining whether the note obligations represent debt or equity.

## VI

The court bypasses the issue of negotiability, a prerequisite for holder in due course status. The court assumes, without deciding, that the notes are negotiable such that holder in due course status could be available.[28]

## VII

■ The court rejects the defendants' defense of promissory estoppel. They assert that Citicorp's execution of the 1993 amendment of the loan modification bars it from contesting the debt character of the advances. That amendment allowed GBA to pay debt service—meaning interest—to Dreyfuss and Schuble on the advances which Dreyfuss represented inaccurately constituted indebtedness. The defendants, in other words, are inequitably trying to hoist themselves up to a superior position by virtue of Dreyfuss's misrepresentations, which were innocently accepted by Citicorp.

In *Choate v. TRW, Inc.*, 14 F.3d 74, 77–78 (D.C.Cir.1994), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837

(1994)(applying D.C. and Virginia law, without deciding which controlled, as dictating same result), the court observed that

> the promissory estoppel doctrine is that a promise that the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and that does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *Granfield v. Catholic University of America,* 530 F.2d 1035, 1042 (D.C.Cir.1976) (citing RESTATEMENT OF CONTRACTS, § 90)....
>
> ... But a promise is "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon." 1 CORBIN ON CONTRACTS § 13 (1963).

Citicorp's execution of the 1993 amendment was not a promise that if the advances by Dreyfuss and Schuble were capital contributions then Citicorp would nevertheless treat them as debt for purposes of any bankruptcy case that GBA filed. The issue of whether the advances constituted debt or equity never arose in the negotiations. Even if the execution could arguably be construed as a promise, it could not *reasonably* be construed as a promise: Dreyfuss well knew that the advances were intended by the partnership to be treated as capital contributions insofar as Dreyfuss and Schuble's rights against GBA were concerned. Moreover, it would be an injustice to enforce any

---

**28.** The notes were not negotiable instruments when they were issued in 1994 because they contained a variable interest rate, which destroyed negotiability. *Beitzell & Co., Inc. v. FDIC (In re Beitzell & Co.),* 163 B.R. 637, 645 n. 5 (Bankr.D.D.C.1993); *1301 Connecticut Ave. Assocs. v. Resolution Trust Corp. (In re 1301 Connecticut Ave. Assocs.),* 126 B.R. 823, 831 (Bankr.D.D.C.1991). A 1995 amendment of the District of Columbia UCC allows prom-

issory notes to contain variable interest rates without destroying negotiability. In contrast to Maryland, which expressly made a similar amendment retroactive, the District of Columbia failed to address whether the amendment would have retroactive effect. The court does not decide the difficult issue whether that amendment applies retroactively to the 1994 notes.

such promise, as enforcement would allow Dreyfuss's false representations to Citicorp that the advances were owed as debts to become a promise by Citicorp.

■ Finally, the defense must also be rejected because there is no evidence that GBA relied on such a promise as fixing the character of the advances for all purposes, or that if there were such reliance, Citicorp should have reasonably expected the promise to induce such reliance. *See Bender v. Design Store Corp.*, 404 A.2d 194, 196 n. 1 (D.C.1979)(quoting Restatement of Contracts § 90 (1932)). "Estoppel is a tort doctrine. The rationale of Section 90 is that justice requires the defendant to pay for harm caused by foreseeable reliance upon the performance of his promise." *Arnold's Hofbrau, Inc. v. George Hyman Constr. Co., Inc.*, 480 F.2d 1145, 1148 (D.C.Cir.1973)(quoting Warren A. Seavey, *Reliance Upon Gratuitous Promises or Other Conduct*, 64 Harv. L.Rev. 913, 926 (1951)).

■ Nor does equitable estoppel apply. That doctrine requires a misrepresentation of fact by the party against whom the doctrine is to be enforced, made to a party who is not aware of the true state of affairs. *Jackson v. Security Fin. Group (In re Jackson)*, 42 B.R. 76, 82 (Bankr. D.D.C.1984); *In re Washington Medical Ctr., Inc.*, 10 B.R. 616 (Bankr.D.D.C.1981). Here, GBA well knew the true facts, and it was Dreyfuss, on GBA's behalf—not Citicorp—who was misrepresenting the facts. To apply the doctrine here would be a perversion of the doctrine.

*Conclusion*

A judgment follows in accordance with the foregoing.