In re SUBMICRON SYSTEMS
CORPORATION, et al.,
Debtors.

Howard Cohen, Plan Administrator for the Estates of Submicron Systems Corporation, Submicron Systems, Inc., Submicron Wet Process Stations, Inc., Submicron Systems Holdings, Inc., Plaintiff,

v.

The KB Mezzanine Fund II, L.P., Equinox Investment Partners, LLC and Celerity Silicon, LLC, Defendants.

C.A. No. 02–752–SLR.
Bankruptcy Nos. 99–2959(SLR) to 99–2962(SLR).
Adversary No. A–00–484.

United States District Court,
D. Delaware.

March 10, 2003.

Joanne B. Wills, of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Wilmington, DE, Counsel for Plaintiff. Of Counsel: Rona J. Rosen, and Carol Ann Slocum, of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, Pennsylvania.

Laura Davis Jones, of Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, DE, Counsel for Equinox Investment Partners, LLC, and The KB Mezzanine Fund II, L.P. Of Counsel: Robert A. Klyman, and John Steele, of Latham & Watkins, Los Angeles, California.

Ian Connor Bifferato, of Bifferato, Bifferato & Gentilotti, Wilmington, DE, Counsel for Celerity Silicon, LLC. Of Counsel: Peter J. Korneffel, Jr., of Brownstein, Hyatt & Farber, P.C., Denver, Colorado.

## OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

On September 1, 1999, debtors SubMicron Systems Corporation ("SubMicron"), SubMicron Systems, Inc. ("SSI"), SubMicron Wet Process Stations, Inc. ("SWPS"), and SubMicron Systems Holdings, Inc. ("SSH") filed separate voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101. On October 15, 1999, the debtors consummated a sale of substantially all of their assets to Akrion, LLC ("Akrion") pursuant to 11 U.S.C. § 363.

On April 18, 2000, the Official Committee of Unsecured Creditors (the "Committee") filed this action as an adversary proceeding against the debtors, KB Mezzanine Fund II, L.P. ("KB"), Equinox Investment Partners LLC ("Equinox"), Celerity Silicon, LLC ("Celerity"), David Ferran and Akrion, LLC ("Akrion"), alleging claims of equitable subordination, recharacterization of debt, breach of fiduciary duty and unjust enrichment. (D.I. 1)

On April 23, 2001, pursuant to the Plan of Liquidation, Howard Cohen, the Plan Administrator, was substituted for the Committee as plaintiff. (D.I. 112) Claims of wrongful transfer of proceeds and aiding and abetting were abandoned by plaintiff, and the only remaining defendants are KB, Equinox and Celerity. (D.I. 18, 114) Defendants moved for summary judgment and on June 27, 2001, this court denied defendants' motion. (D.I. 39, 79, 82, 146) Between July 30 and August 2, 2001, the court held a bench trial on the issues. The following are the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## II. FINDINGS OF FACT

### A. The Parties

1. SubMicron Systems Corporation ("SubMicron") was a Delaware corporation having its principal place of business in

Allentown, Pennsylvania. SubMicron was involved in the design, manufacture and marketing of wet benches used in the semiconductor industry. (PX 95; TT 54)[1]

2. The KB Mezzanine Fund II, L.P. ("KB") is an investment fund formed in 1995 by Kleinwort Benson. The purpose of the fund is to invest in debt and equities securities in order to achieve the goal of obtaining a return on investment. (TT 207–08)

3. Equinox Investment Partners, LLC ("Equinox") is a company formed in 1996 to manage the KB Mezzanine Fund II after Kleinwort Benson was acquired by Dresdner Bank. (TT 209–10) Hereinafter, KB and Equinox may be collectively referred to as "KB/Equinox."

4. Celerity Silicon, LLC ("Celerity") is a California-based investment fund. (D.I. 146 at 3)

5. Howard Cohen is a principal with the accounting and consulting firm of Parente Randolph and was retained as the plan administrator of the SubMicron bankruptcy cases in September 1999. (TT 689–90)

### B. Background

6. **SubMicron through 1997.** By early 1997, SubMicron was experiencing financial and operational difficulties. (TT 57–58, 569) In May 1997, David Ferran was hired by SubMicron as CEO to turn the company around. (TT 427)

7. On November 25, 1997, SubMicron entered into a formula-based $15 million working capital facility with Greyrock Business Credit ("Greyrock") that was secured by first priority liens on all inventory, equipment, receivables and other property of SubMicron. (PX 15–16; TT 60)

8. On November 26, 1997, SubMicron issued $16 million of senior subordinated 12% notes to KB/Equinox and $4 million of senior subordinated 12% notes to Celerity (collectively "the 1997 notes"), both due February 1, 2002. The 1997 notes were secured by second priority liens, second to Greyrock, on substantially all of SubMicron's assets. (DX 142 at 7720; TT 175–78)

9. In connection with the 1997 notes, both KB/Equinox and Celerity received a seat on the Board of Directors of SubMicron. Michael Khougaz, a principal at KB/Equinox, and Mark Benham, a principal at Celerity, were each initially given a seat on the Board. (PX 23; TT 67–68)

10. For the 1997 fiscal year SubMicron incurred a net loss of $47.6 million. (PX 95, DX 30 at 36) The 1997 notes were recorded as secured debt on SubMicron's 10K SEC filing and UCC–1 financing statements. (DX 19, 29; TT 132–33)

11. **SubMicron in 1998.** During 1998, the operational aspect of SubMicron improved, however, due to a downturn in the semiconductor industry, the company continued to struggle financially. (PX 95; TT 430–31)

12. Until February 1, 1998, SubMicron was paying cash interest on the 1997 notes. However, after February 1, 1998, SubMicron began paying half the interest in cash and half in paid in kind ("PIK") senior subordinated notes. By August 1, 1998, SubMicron was paying substantially all of the interest on the 1997 notes as PIK. (PX 38; TT 227)

13. At the end of 1998, the Greyrock financing was up for renewal and on December 2, 1998, Greyrock reduced the maximum funds available to SubMicron from $15 million to $10 million but includ-

---

1. Plaintiff's exhibits shall be referred to as "PX," defendants' exhibits shall be referred to as "DX," and the trial transcript shall be referred to as "TT."

ed a $2 million overadvance in additional funding. This overadvance, however, was conditioned on SubMicron securing an additional $4 million in equity and/or subordinated debt and obtaining interest payment deferrals from KB/Equinox, Celerity and SubMicron's other noteholders. (PX 45; TT 74–75)

14. In order to secure the additional equity and/or subordinated debt, SubMicron issued a Series B 12% note in the amount of $3.2 million to KB/Equinox and a Series B 12% note in the amount of $800,000 to Celerity on December 3, 1998 (collectively "the 1998 notes"). The 1998 notes ranked *pari passu* with the 1997 notes and the interest was deferred until October 1, 1999. (PX 47; TT 75–76)

15. For the 1998 fiscal year, SubMicron incurred a net loss of $21.9 million and the liabilities of SubMicron exceeded its assets by $4.2 million. (PX 95, DX 30 at 36; TT 84) The 1998 notes were recorded as secured debt on SubMicron's 10K SEC filing and UCC–1 financing statements. (PX 95, DX 30, 286)

16. **SubMicron in 1999.** On January 19, 1999, Kevin Lynch, Bonaparte Liu and Robert Wickey, all of KB/Equinox, were elected to the Board of Directors of SubMicron. (PX 51; TT 87) The Board was comprised of David Ferran of SubMicron, the three KB/Equinox members, one Celerity member, and three other independent members. (PX 51)

17. On February 26, 1999, Robert Wickey, a member of SubMicron's Board of Directors and a managing member of the KB/Equinox fund primarily responsible for the SubMicron investment, proposed a debt for equity exchange at a meeting of the Board to "bring the Company's balance sheet into line" in order to be able to obtain additional funding or enter into a strategic partnership. (PX 59, 61; TT 237–39, 312–13) Mr. Wickey then pre-

sented his debt for equity exchange proposal to other investors/noteholders. (PX 81, 87, 100) Ultimately, however, no debt for equity exchange occurred since the demands for ownership in the post-exchange total by the noteholders exceeded 100% ownership in SubMicron. (PX 100; TT 252–253)

18. Between late February and early March 1999, the management of SubMicron determined that in order to fund its immediate and critical working capital needs, SubMicron would need to issue up to $6,480,000 in Series 1999 12% notes due February 1, 2002. (PX 61, 62) A Special Finance Committee of KB/Equinox subsequently approved the additional funds to SubMicron. (PX 74)

19. In response to this decision, SubMicron issued a number of Series 1999 12% notes between March 10, 1999 and June 6, 1999. (PX 194) In this time period, SubMicron issued nine notes to KB/Equinox totaling $5,888,123, and nine notes to Celerity totaling $1,147,031 for a sum total of $7,035,154 of Series 1999 12% notes (collectively "the 1999 notes"). (PX 78, 79, 85, 86, 98, 99, 104, 105, 106, 107, 110, 111, 112, 113, 117, 118, 127; TT 105–112) Had KB/Equinox and Celerity not made these loans to SubMicron, SubMicron would not have been able to make payroll and would have been forced to cease operations. (TT 340–41, 850)

20. When issuing notes, a member of SubMicron's accounting department would enter the date and amount funded into a computer and the computer would automatically generate a note. (TT 112–13) In issuing notes, members of SubMicron's accounting department occasionally made mistakes in data entry resulting in incorrect notes. For example, on November 26, 1997, SubMicron issued notes for $17 million to KB/Equinox and $3 million to Cel-

erity. However, the amounts financed were actually $16 million by KB/Equinox and $4 million by Celerity as disclosed in SubMicron's bankruptcy schedules. (PX 18, 18(a), DX 142 at 7720, DX 144 at 7506, DX 146 at 7854; TT 176–78, 928) Additionally, on December 3, 1998, SubMicron issued a note to Celerity in the amount of $8 million when the amount funded was actually $800,000. (PX 47; TT 76)

21. Between July 8, 1999, and August 31, 1999, SubMicron periodically received additional funding from KB/Equinox totaling $3,982,031 and from Celerity totaling $147,969, however, no additional notes were issued for these funds. (PX 194) Thus, KB/Equinox's total funding to SubMicron in 1999 was $9,870,154 and Celerity's total funding to SubMicron in 1999 was $1,295,000 for a total of $11,165,154 (collectively "the 1999 fundings"). (PX 194)

22. For the first quarter of the 1999 fiscal year, SubMicron incurred a net loss of $4.3 million and its current liabilities exceeded its current assets by $5.3 million. (PX 114; TT 117–118) By June 30, 1999, SubMicron incurred a net loss of $9.9 million and its current liabilities exceeded its current assets by $3.1 million. (PX 134; TT 119–20)

23. In 1999, SubMicron was insolvent, undercapitalized, had no ability to pay cash interest on any of its debt and no third parties other than KB/Equinox and Celerity, who already had an economic stake in SubMicron, would have been willing to loan SubMicron more money. (TT 1132, 1136–38, 1171, 1174)

24. On May 25, 1999, David Ferran, the President and CEO of SubMicron, tendered his tentative resignation based on his concerns about SubMicron being able to continue its operations while maintaining its obligations to its employees, trade vendors, and customers. (PX 116) However, Mr. Ferran's continued employment with SubMicron was integral to the possibility of a turnaround of SubMicron's financial situation. Had he resigned, other senior executives would likely have resigned as well. (TT 343, 358) On May 26, 1999, Mr. Ferran documented a number of conditions under which he would retract his resignation. First and foremost, Mr. Ferran required that KB/Equinox and Celerity provide additional funds beyond the originally agreed $6.4 million, which had been reached, until the company was sold. (DX 222; TT 353–54)

25. In response to Mr. Ferran's conditions, Mr. Wickey made a proposal to the KB/Equinox Investment Committee for the approval of an additional $7.2 million, in conjunction with Celerity, in funding to SubMicron. (PX 125, 126) KB/Equinox performed no valuations to determine whether or not there was any collateral value to support additional fundings. (TT 373) The KB/Equinox Investment Committee approved the additional investment of funds and, between June 1999 and August 31, 1999, KB/Equinox and Celerity provided additional funds periodically. (PX 194) However, neither KB/Equinox nor Celerity received notes for these additional transactions as they had in their previous rounds of funding pursuant to established procedure. (TT 376–77)

26. The 1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing and UCC–1 financing statements. (PX 134, DX 72, 259; TT 161)

27. Since at least 1997, SubMicron was actively searching for a buyer or merger partner for the company. (TT 585–86) On or around June 2, 1999, a company called CFM Technologies was the leading candidate for such a transaction and the parties were in negotiations. (PX 126; TT 348–49) On July 7, 1999, CFM Technologies

informed SubMicron that it was no longer interested in pursuing a deal. (TT 278–79)

28. After the deal with CFM Technologies fell through, SubMicron began negotiating a deal with another company, Sunrise Capital Partners, L.P. ("Sunrise"). (PX 145, 149) If a deal with Sunrise was not reached, SubMicron would have been forced to go out of business, secured creditors would have received pennies on the dollar and unsecured creditors and shareholders of SubMicron would have received nothing. (TT 598–99)

29. By June 1999, due to a number of resignations of members of SubMicron's Board of Directors, KB/Equinox and Celerity had a numerical majority on the Board. (TT 389) The Board consisted of David Ferran, CEO of SubMicron; Mark Benham of Celerity; and Robert Wickey and Bonaparte Liu of KB/Equinox. (PX 152)

30. At a July 21, 1999 Board meeting, Messrs. Ferran, Wickey and Liu voted to authorize the management of SubMicron to execute a letter of intent to sell the company to Sunrise. Mr. Benham of Celerity abstained from the vote. (PX 152) Mr. Benham subsequently resigned from the Board of Directors. (TT 473)

31. Once the SubMicron Board approved the sale transaction to Sunrise, KB/Equinox began negotiating the financial structure and terms of the sale with Sunrise. (TT 477–79)

## C. The Sale of SubMicron

32. In order to facilitate a sale, a company called Akrion, LLC was created by Sunrise and its counsel to be the acquisition vehicle. (TT 650–51, 959)

33. On August 31, 1999, SubMicron and Akrion entered into an asset purchase agreement. (PX 203 at 1281; TT 633) The asset purchase agreement provided, *inter alia*, that contingent on the closing of the sale, KB/Equinox and Celerity would contribute their secured claims (the 1997, 1998, 1999 notes, and the additional fundings through August 31, 1999) to Akrion in order for Akrion to credit bid the claims. (PX 186, 188, 192, 203 at 1232; TT 631–33) In return for their claims, KB/Equinox and Celerity would receive either a membership interest in Akrion, appreciation units, or both. (TT 633) The asset purchase agreement also provided that at the closing of the sale, SubMicron would pay $5.5 million immediately to the holders of the 1999 notes. (PX 203 at 1291) There was also a clause in the agreement that if the court did not approve this provision, the sale price would be reduced by $5.5 million. (PX 203 at 1290; TT 974–75) The court and Creditors Committee were fully apprized of the terms of the agreement prior to the sale. (TT 975, 980)

34. The asset purchase agreement and structure of the transaction was predominantly developed by Sunrise and its counsel; given SubMicron, KB/Equinox and Celerity's inferior bargaining positions, they had little leverage to negotiate the terms. (TT 954–55)

35. On September 1, 1999, SubMicron filed for bankruptcy under Chapter 11. SubMicron and Akrion then proposed an asset sale of substantially all of SubMicron's assets to Akrion pursuant to 11 U.S.C. § 363. (PX 203) The asset sale was structured in a number of steps.

36. First, Akrion would be capitalized through a number of transactions. Sunrise would initially contribute $17 million in cash to Akrion from which Sunrise would receive approximately a 68% interest in Akrion. (PX 230 at 2207; TT 651)

37. Next, KB/Equinox would provide $3,509,689 in cash to be valued at $3 million for interest purposes. KB/Equinox

would also contribute $10,509,689 in Series 1999 12% notes as well as $3,593,000 in post-petition DIP financing to SubMicron. KB/Equinox would also contribute its 1997 and 1998 notes to Akrion. (TT 653, 658) These contributions would be valued at $4,535,037 plus a unit interest for a total contribution by KB/Equinox of $7,535,037 for which KB/Equinox would receive approximately a 30% interest in Akrion. (PX 230 at 2207; TT 646–48, 658) The transfer of the 12% notes would be contingent on the sale of SubMicron closing. (TT 653)

38. Celerity would contribute $1,365,469 in Series 1999 12% notes valued at $368,953 plus a unit interest for which Celerity would receive approximately a 1.475% interest in Akrion. (PX 230 at 2208; TT 648–49) Celerity would also contribute its 1997 and 1998 notes to Akrion; again, the transfer of the 12% notes would be contingent on the sale of SubMicron closing. (TT 653–54)

39. Finally, David Ferran would contribute $94,605 in cash for which he would receive approximately a 0.378% interest in Akrion. (PX 230 at 2208; TT 493–94) James Molinaro would also make a nominal $1 contribution. (PX 230 at 2208)

40. During September and October 1999, Mr. Cohen, as plan administrator, and/or members of his firm Parente Randolph reviewed the asset sale agreement, reviewed depositions in preparation for the sale hearing, and attended the sale hearing. (TT 739–44)

41. Between October 11–13, the court held a sale hearing and was fully apprized of the terms of the asset sale agreement and the transaction. (D.I. 100, 104) At the hearing, the Creditors Committee objected to the sale on the grounds that it did not satisfy the requirements of § 363, namely: (1) there was no reasonable notice of the sale; (2) the sale was not for sound business purposes; (3) there was not fair and reasonable consideration offered by the purchaser; and (4) the sale was not in good faith. In a memorandum order, the court rejected each of these arguments and approved the sale. (D.I. 116)

42. Akrion then submitted a bid in the amount of $55,507,587 for SubMicron. (TT 652) The bid was comprised of three components. First was the cash component, which included $5,500,000 in cash from Akrion; $3,382,000 in pre and post-petition Greyrock debt; and $850,000 in administrative claims for a total of $10,202,000. Second was the credit portion of the bid, which included the $38,721,637 in 12% secured notes from KB/Equinox and Celerity as well as $1,324,138 in individual secured claims for a total of $40,045,775. Third was the liabilities that Akrion would assume from SubMicron including $681,346 in lease obligations and $4,578,466 in other assumed liabilities for a total of $5,259,812. (PX 203 at 1232)

43. SubMicron's Board of Directors accepted this bid and the court was apprized of the terms and approved the acceptance of the bid. (DX 4; TT 652, 971–72)

44. At the time of Akrion's bid, there was no other company interested in buying SubMicron. (TT 367, 545, 596, 1094)

45. On October 15, 1999, the asset sale closed. At the closing, some of the amounts from the asset sale agreement varied somewhat, but the transaction essentially proceeded as planned. The flow of cash in the asset sale is summarized as follows:

**Funding of Akrion**

- Sunrise contributed $17,000,000 in cash to Akrion. (PX 281)

- KB contributed $3,000,000 in cash to Akrion. (PX 281)

- David Ferran contributed $94,605 in cash to Akrion. (PX 281)

- James Molinaro contributed $1 in cash to Akrion. (PX 281)

**Funding the Purchase Price to Sub-Micron**

- Akrion then paid $11,877,745.10 in cash to SubMicron. (PX 281)

**SubMicron's Payments to Creditors**

- SubMicron paid Greyrock $5,527,745.10 in cash in satisfaction of its debts to Greyrock. (PX 281)

- SubMicron paid $4,903,989 cash back to Akrion in satisfaction of Series 1999 note holders. (PX 281)

- SubMicron paid $596,011 in cash to various parties in satisfaction of various holders of retention programs. (PX 281)

46. At the closing no cash went directly to KB/Equinox or Celerity from SubMicron. (PX 281; TT 782)

**D.  Plaintiff's Requested Relief**

47. While both parties' positions and theories evolved during the case, plaintiff now seeks four alternative remedies against defendants (D.I. 164 at 4):

(a) recharacterization of the 1999 fundings as equity, not debt, and the concomitant finding that the defendants' rights were subordinate to the claims of unsecured creditors;

(b) recharacterization of the 1999 fundings as unsecured debt, necessitating the sharing *pari passu* of the KB/Equinox and Celerity distributions with other unsecured creditors;

(c) the equitable subordination of the 1999 fundings to the claims of unsecured creditors; or

(d) imposition of a constructive trust.

## III.  CONCLUSIONS OF LAW

### A.  Recharacterization of the 1999 Fundings as Equity

■ 1.  **Standards for recharacterization.** Bankruptcy courts have long been recognized as courts of equity. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Its equitable powers allow a bankruptcy court to produce fair and just results "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). "The ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance." *In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir.1991); *see also In re Autostyle Plastics, Inc.*, 269 F.3d 726, 748 (6th Cir.2001).

■ 2.  Recharacterization of a claim from debt to equity is similar to the subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of other creditors. *In re Autostyle*, 269 F.3d at 748. However, there are important differences between a recharacterization analysis and an equitable subordination analysis. *Id.*

■ 3.  Recharacterization cases turn on whether a debt actually exists, not on whether the claim should be equitably subordinated. *Id.* (citation omitted). In a recharacterization analysis, "if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." *Id.* at 749.

4. Under an equitable subordination analysis, the court determines whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim "to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective." *Id.* (quoting *In re W.T. Grant Co.*, 4 B.R. 53, 74 (Bankr.S.D.N.Y.1980)).

5. If a claim is recharacterized and, therefore, "the advance is not a claim to begin with" and the creditor is not a legitimate one, "then equitable subordination never comes into play." *Id.* (quoting *In re Georgetown Bldg. Assocs. v. PWA*, 240 B.R. 124, 137 (Bankr.D.D.C.1999)). Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading some courts to equitably subordinate claims that other courts would recharacterize as equity contributions. *Id.*

6. "Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders." *In re Color Tile, Inc.*, 2000 WL 152129, 2000 U.S. Dist. LEXIS 1303 (D.Del., February 9, 2000) (citing *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del.1969)).

7. In interpreting the contract, this court has considered numerous factors, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. *In re Color Tile, Inc.*, 2000 WL 152129, *4, 2000 U.S. Dist. LEXIS 1303, *14 (D.Del., February 9, 2000).

8. However, "where the same individuals control both the transferor and the transferee, the transaction must be scrutinized according to 'an objective test of economic reality' to determine its true economic nature." *Geftman v. Commissioner*, 154 F.3d 61, 75 (3d Cir.1998).

9. **Plaintiff's arguments.** Plaintiff argues that scrutiny of the 1999 fundings under an objective test of economic reality compels the conclusion that the fundings were capital contributions as opposed to debt. (D.I. 164 at 26) In support of his argument, plaintiff points to a number of factors he alleges would characterize the fundings as equity as opposed to debt.

10. First, plaintiff argues that SubMicron was insolvent, severely undercapitalized, and that no disinterested third-party lender other than defendants would lend money to SubMicron.

11. Second, plaintiff argues that the *sine qua non* of bona fide debt is the expectation of repayment. He asserts that defendants knew SubMicron had no ability to repay the advances and SubMicron's ability to repay was irrelevant to them.

12. Third, plaintiff argues that a true lender of debt would be interested in SubMicron's ability to pay interest on the 1999 notes. He asserts that the fact that defendants did not require cash payments of interest or establish a sinking fund for repayment evidences that the 1999 fundings by defendants were equity rather than debt.

13. Fourth, plaintiff argues that SubMicron's gross undercapitalization indicates that the 1999 fundings were actually intended to be risked capital rather than a loan. He contends that SubMicron's debt

to equity ratio of 900 to 1 weighs heavily in favor of finding that the 1999 fundings were equity infusions rather than loans.

14. Fifth, plaintiff asserts that the fact that defendants had seats on SubMicron's Board of Directors and eventually had a majority on the Board, supports a finding that the 1999 fundings were equity instead of debt.

15. Sixth, plaintiff argues that the existence of notes for some of the 1999 fundings was merely an exercise in form over substance and the fact that a number of fundings did not even have notes or documents associated with them illustrate that defendants used the notes as little more than a bookkeeping device to keep track of their capital contributions.

16. Seventh, plaintiff argues that there was an absence of any collateral available to secure the 1999 fundings. He asserts that defendants did not perform an evaluation of SubMicron's collateral prior to making the advances because they knew that there was no collateral.

17. Finally, plaintiff argues that the way SubMicron used the funds as well as the *pro rata* contributions by defendants illustrates that the 1999 fundings were equity infusions rather than loans.

18. **Defendants' arguments.** Defendants similarly advance a list of arguments why the 1999 fundings should be classified as debt as opposed to equity. (D.I. 174) Additionally, defendants argue that plaintiff has failed to show defendants acted inequitably and it is well-established Third Circuit precedent that recharacterization is an equitable remedy that may only be applied to cure inequitable conduct.

19. In support of their argument that the 1999 fundings were not merely equity disguised as debt, defendants first argue that recharacterization cannot be used against non-shareholders. Since neither KB/Equinox or Celerity were pre-petition owners of any stock of the debtors, recharacterization may not apply to the 1999 fundings.

20. Next, defendants argue that the nature of the 1999 fundings evidence debt not equity. In support of this argument defendants contend that: (1) the 1999 Notes were express debt instruments and contained the terms and conditions only found on debt instruments, the fact that some notes were not produced is inapposite; (2) the 1999 Notes had fixed maturity periods, interest rates, and payment dates; (3) the fact that repayment was not dependent on corporate earnings evidences that the 1999 fundings were debt; (4) the fact that debtors granted defendants a security interest illustrates debt; (5) the fact that the 1999 fundings were given priority over almost all other creditors evidences debt; (6) the undisputed intent of the parties was to create debt, not equity; and (7) the fact that no increase in the management of SubMicron flowed from the 1999 fundings evidences debt, not equity.

21. With regard to plaintiff's argument that SubMicron was grossly undercapitalized when defendants made the 1999 fundings, defendants argue that courts today give that factor "no independent relevance." Furthermore, there is no evidence that creditors were deceived by debtors' capital structure. Finally, plaintiff's expert's 900 to 1 debt capacity ratio is meaningless in distressed lending scenarios.

22. Defendants also argue that the fact that no independent lenders would loan SubMicron money in 1999 does not mean defendants were acting irrationally. To the contrary, they were merely trying to protect their previous $24 million in investments during the 1997–98 periods. If defendants did not provide the 1999 fundings, it was undisputed that SubMicron

would have been liquidated and defendants would have received little or nothing on their previous loans. When a company is in distress, the only parties motivated to put new money in are those that already have a financial stake; this is the action of any reasonable lender under the circumstances at bar.

23. Defendants additionally argue that the 1999 fundings were used by SubMicron to fund operations, not to acquire additional capital or manufacturing assets. These were cash infusions to meet the daily operating needs of the company to get it to a sale. Furthermore, SubMicron's Board of Directors ratified the 1999 fundings as debt.

24. Finally, defendants assert that plaintiff cannot demonstrate any harm caused to the unsecured creditors by defendants actions. The secured creditors' claims exceeded all cash generated through the asset sale. Even if the 1999 fundings were recharacterized or subordinated, none of the approximately $11 million cash payments from Akrion to SubMicron would reach the unsecured creditors anyway.

■ 25. **The court's conclusions.** The court concludes that plaintiff has not proven by a preponderance of the evidence that the 1999 fundings should be recharacterized as equity.

26. Under the first three *Color Tile* factors, it is beyond dispute in the record that: (1) the name given to the 1999 fundings was debt; (2) the intent of the parties was to create debt; and (3) the 1999 fundings had a fixed maturity date and interest rate. These factors all favor characterization as debt.

27. Plaintiff's argument that SubMicron was insolvent, severely undercapitalized, unable to pay cash interest, and that no disinterested third-party lender other

than defendants would lend money to SubMicron, by itself is not dispositive that the 1999 fundings were equity infusions as opposed to debt.

■ 28. "When a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital." *In re Autostyle Plastics, Inc.,* 269 F.3d 726, 746–47 (6th Cir.2001). However, undercapitalization alone is insufficient to justify the subordination of insider claims; there must be evidence of other inequitable conduct. *Id.* This is because "any other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company." *In re Octagon Roofing,* 157 B.R. 852, 858 (N.D.Ill.1993).

29. Plaintiff has failed to prove that under SubMicron's dire circumstances, defendants' transactions were improper or unusual. In fact, plaintiff's only expert admittedly had no experience with lending to distressed companies.

30. Defendants' expert, with over 30 years in lending including dozens of distressed company situations, testified that when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders look at (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company. (TT 1132–39)

31. Plaintiff's argument that defendants had seats on SubMicron's Board of Directors is equally unpersuasive. Defendants' witnesses testified that it was not unusual for lenders to have designees on a company's board, particularly when the

company was a distressed one. Lenders often have the designees to keep a close eye on the company's financial situation to protect their investments. Furthermore, plaintiff has not proven that defendants or their designees controlled or dominated SubMicron's Board in any way.

32. Finally, plaintiff's argument that some of defendants' 1999 fundings had notes while others did not is similarly unavailing. The record is clear that Sub-Micron's accounting department made numerous mistakes and errors when generating notes. The fact that notes were generated for some fundings and not others is not sufficient, in and of itself, to recharacterize the 1999 fundings as equity.

33. Plaintiff is unable to demonstrate that any factor weighs strongly in favor of recharacterizing the 1999 fundings as equity. While several factors lean slightly toward equity, such as the absence of a sinking fund and the adequacy of capitalization or collateral, the majority of other factors weigh toward characterization as debt.

34. Furthermore, the court concludes that plaintiff has failed to show that under SubMicron's financially distressed circumstances, defendants' 1999 fundings were irrational, improper, or equity infusions disguised as debt. Therefore, the court shall not recharacterize the 1999 fundings as equity.

## B. Recharacterization of the 1999 Fundings as Unsecured Debt

35. **Plaintiff's arguments.** Plaintiff argues that even if the court finds that the 1999 fundings are debt, at best, they should be characterized as unsecured debt. In support of this argument plaintiff con-

tends that the debtors never signed a security agreement granting defendants a security interest, no UCC–1 financing statements naming defendants as secured creditors were ever filed, and there was no available collateral to secure the 1999 fundings.[2]

36. Plaintiff argues that the defendants failed to comply with the requirements of §§ 9–201, 9–402 of the UCC and, thus, failed to perfect their security interests in the 1999 fundings. In support of this argument, plaintiff contends that there are no documents in evidence specifically naming defendants as secured parties, rather, the UCC–1 financing statements only identified the secured parties as "Equinox Investment Partners, LLC," "United Trust Company of New York," and "Wilmington Trust Company," all as "collateral agents." He argues that no documents were introduced describing any collateral agent agreements between defendants and these entities.

37. Finally, plaintiff argues that defendants did not dispute that there was no available collateral to secure the 1999 fundings. In fact, defendants did not obtain a valuation of SubMicron's assets prior to making the 1999 fundings because they knew no collateral existed.

38. Furthermore, plaintiff argues that defendants did not receive their equity interest in Akrion from the value of their 1999 claims but, rather, from the $3.5 million in new cash they put into the company. Since the market place made no determination as to the asset value of defendants' 1999 claims, they cannot rely on payment of those claims to SubMicron in the asset sale to establish the value of their collateral.

---

**2.** Plaintiff also argues that no collateral was available to secure the 1997 and 1998 notes, however, these transactions are beyond the

scope of the trial and the court will not address them.

39. Plaintiff contends that as unsecured claims, defendants had no right to credit bid the claims under § 363(k).

40. **Defendants' arguments.** Defendants spend much of their argument on the irrelevant 1997 and 1998 transactions. Defendants' remaining arguments appear to focus on the contention that valuation of collateral under a § 363 sale is unnecessary and, therefore, the credit bid of the 1999 fundings was proper.

41. Defendants further argue that under Rule 3003 of the Federal Rules of Bankruptcy Procedure, absent the filing of a contrary proof of claim by a creditor, a debtor's filed bankruptcy schedule is valid. Since SubMicron filed a bankruptcy schedule listing the 1999 fundings as secured debt and their value, and there was no objection, the secured status of the 1999 fundings is valid.

42. **The court's conclusions.** The court concludes that by 1999, SubMicron was insolvent and there was no collateral available to actually secure the 1999 fundings. Defendants were well aware of this fact. However, it is also evident that the parties intended the 1999 fundings to be secured debt and that defendants were protecting their past investments (secured debt) by the additional loans.

43. Under these circumstances, the court declines to recharacterize the 1999 fundings as unsecured debt.

## C. Equitable Subordination of the 1999 Fundings

44. **Standards for equitable subordination.** The judicially created doctrine of equitable subordination developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt. *Pepper,* 308 U.S. at 311, 60 S.Ct. 238. This doctrine is now codified at 11 U.S.C. § 510(c), which provides that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

45. Courts have recognized that equitable subordination is an unusual remedy which should be applied only in limited circumstances. *Holt v. Federal Deposit Insurance Corp.,* 868 F.2d 146, 148–49 (5th Cir.1989). Moreover, the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct. *Trone v. Smith,* 642 F.2d 1174, 1178 (9th Cir.1981)

46. Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. *Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998) (citing *U.S. v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)).

47. The courts have recognized three general categories of conduct which may constitute inequitable conduct warranting equitable subordination: (1) fraud, illegality, breach of fiduciary duties; (2) underca-

pitalization; and (3) claimant's use of the debtors as a mere instrumentality or alter ego. *In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir.1991).

48. **Plaintiff's arguments.** In support of his argument for equitable subordination, plaintiff contends that defendants were insiders of SubMicron and were obligated to provide full and candid disclosure of the § 363 sale and bidding strategy. (D.I. 164 at 41) As insiders, defendants owed fiduciary duties to the unsecured creditors while the company was in the vicinity of insolvency and as directors of the debtor-in-possession. Plaintiff also asserts that defendants are not entitled to protection under the business judgment rule since they had personal interests in the transaction.

49. Plaintiff contends that defendants breached their fiduciary duties to the unsecured creditors and attempted to shield their interests in SubMicron from judicial scrutiny. In order to achieve this, he argues that defendants breached their duties by: (1) allowing the use of an improper credit bid; (2) misrepresenting the cash component of the transaction; (3) allowing the "double bidding" of $5.5 million; (4) failing to give reasonable notice of how they were obtaining an equity interest in Akrion; (5) artificially inflating the bid to chill interest from other potential bidders; and (6) misrepresenting the transaction to the court at the asset sale hearing.

50. As a result of this breach of fiduciary duties, plaintiff argues that defendants gained an advantage by wrongfully elevating their priority claims over the claims of the unsecured creditors and taking a corporate opportunity for themselves without offering it to the unsecured creditors as well.

51. **Defendants' arguments.** Defendants argue that they owed no fiduciary duties to the unsecured creditors and even if they did, they did not breach any of their duties to them. (D.I. 174 at 36) Defendants argue that the fact that they had designees who sat on the Board of SubMicron does not give rise to a fiduciary duty on the part of defendants. Furthermore, lenders owe no duties to a debtor or the debtor's creditors unless the lender exercises complete control over the debtor.

52. Defendants argue that plaintiff has failed to show that they exercised complete control over debtors' operations. In fact, defendants and their designees on SubMicron's Board expressly sought to avoid control. Defendants assert that even if the court finds that defendants owed a fiduciary duty to SubMicron and its creditors, it could not find that they owed any duties to any of SubMicron's subsidiaries since they did not sit on those Boards.

53. In response to plaintiff's allegations that defendants misrepresented the credit bid, double bid $5.5 million, and artificially inflated the bid, defendants argue that the sale agreement was fully disclosed to and approved by the court, it was the best transaction possible for all parties, no other bidders existed, and plaintiff has failed to prove harm on behalf of the unsecured creditors.

54. Finally, defendants argue that plaintiff's claim of equitable subordination is inconsistent with the bankruptcy code. In support of this argument, defendants state that equitable subordination would allow creditors who were not harmed to share with creditors who were harmed.

55. **The court's conclusions.** The court concludes that plaintiff has failed to show that defendants engaged in any fraud, illegality, or breach of fiduciary duties warranting equitable subordination.

56. Plaintiff's argument that the § 363 sale was conducted in bad faith and with-

out fair notice was already heard and rejected by this court in connection with the sale hearing. Plaintiff has introduced no new evidence at trial warranting that the court change its initial position. As defendants point out, the court and Committee were fully apprized of the terms of the sale agreement and three days of hearings were held. The fact that there may have been some misstatements regarding the complex and confusing transaction at the hearing does not change the fact that the court had the documents to review and certainly does not rise to level of bad faith requiring the drastic remedy of equitable subordination.

57. Assuming that defendants did owe fiduciary duties to the unsecured creditors, plaintiff has failed to show that defendants breached these fiduciary duties or that the unsecured creditors suffered any harm as the result of defendants' actions.

58. The trial testimony is uncontradicted that had defendants not made the 1999 fundings to SubMicron, the company would have been forced to close down and liquidate, leaving the unsecured creditors with nothing.

59. Furthermore, the record shows that there were no other parties interested in acquiring SubMicron at the time of the bid. Plaintiff has failed to show that any other party was willing to bid on SubMicron at any price. In fact, the testimony shows that Sunrise/Akrion was the deal of last resort for SubMicron and the company aggressively sought other suitors prior to the Sunrise/Akrion deal. Given these facts, plaintiff has not proven that any harm resulted from any improper double bidding or inflated bid price.

**D. Imposition of a Constructive Trust**

60. Based on his arguments in support of equitable subordination for breach of fiduciary duty, plaintiff contends

that it is within the court's power to impose a constructive trust against defendants. Given that the court has concluded that equitable subordination is not an appropriate remedy in this case, for the reasons stated, it shall not impose a constructive trust.

## IV. CONCLUSION

For the reasons stated, the 1999 fundings were properly characterized as debt, the 1999 fundings shall be characterized as secured debt, equitable subordination of the 1999 fundings is not appropriate, and a constructive trust shall not be imposed. An appropriate order shall issue and judgment shall be entered accordingly.