

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-6-2006

# In Re: Submicron Sys

Precedential or Non-Precedential: Precedential

Docket No. 03-2102

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Submicron Sys " (2006). *2006 Decisions.* Paper 1685.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1685

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 03-2102

————————

In Re: SUBMICRON SYSTEMS CORPORATION, et al,
Debtors

HOWARD S. COHEN, as Plan Administrator
for the Estates of
SubMicron Systems Corporation, SubMicron Systems Inc.,
SubMicron Wet Process Stations Inc. and SubMicron Systems
Holdings I Inc.,

Appellants

v.

KB MEZZANINE FUND II, LP;
EQUINOX INVESTMENT PARTNERS, LLC; and
CELERITY SILICON, LLC

————————

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 02-cv-00752)
District Judge: Honorable Sue L. Robinson

————————

Argued September 14, 2004

Before: SCIRICA, <u>Chief Judge</u>, ALITO
and AMBRO, <u>Circuit Judges</u>

(Filed   January 6, 2006 )

Rona J. Rosen, Esquire
Klehr, Harrison, Harvey
Branzburg & Ellers
260 South Broad Street
Suite 400
Philadelphia, PA  19102

Joanne B. Wills, Esquire (Argued)
Klehr, Harrison, Harvey,
Branzburg & Ellers
919 North Market Street
Suite 1000
Wilmington, DE   19083

        Attorneys for Appellant

Laura D. Jones, Esquire
Pachulski, Stang, Ziehl, Young,
Jones & Weintraub
919 North Market Street
P.O. Box 8705, 16th  Floor
Wilmington, DE   19801

2

Peter J. Korneffel, Jr., Esquire
Brownstein, Hyatt & Farber
410 Seventeenth Street
22nd Floor
Denver, CO   80202

Robert A. Klyman, Esquire (Argued)
David D. Johnson, Esquire
Latham & Watkins LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA   90071-2007

        Attorneys for Appellees

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Appellant Howard S. Cohen ("Cohen"), as Plan Administrator for the bankruptcy estates of SubMicron Systems Corporation, SubMicron Systems, Inc., SubMicron Wet Process Stations, Inc. and SubMicron Systems Holdings I, Inc. (jointly and severally, "SubMicron"), challenges the sale to an entity created by Sunrise Capital Partners, LP ("Sunrise") of SubMicron's assets under 11 U.S.C. § 363(b), which authorizes court-approved sales of assets "other than in the ordinary course of business."  Sunrise negotiated directly with several—but not

3

all—of SubMicron's creditors before presenting its bid to the District Court. These creditors—The KB Mezzanine Fund II, LP ("KB"), Equinox Investment Partners, LLC ("Equinox"),[1] and Celerity Silicon, LLC ("Celerity") (collectively, the "Lenders")—agreed to contribute toward the purchase of SubMicron's assets new capital along with all of their claims in bankruptcy against SubMicron in exchange for equity in the entity formed by Sunrise to acquire the assets—Akrion LLC ("Akrion"). Akrion in turn "credit bid" the full value of the Lenders' secured claims contributed to it as part of its bid for SubMicron's assets pursuant to 11 U.S.C.§ 363(k).[2] The

---

[1] Equinox was formed in 1996 to manage KB after it was acquired by Dresdner Bank. For the sake of simplicity, we shall refer to both entities simply as "KB/Equinox."

[2] This provision reads:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

4

District Court approved the sale.[3]  *In re SubMicron Sys. Corp.*,
291 B.R. 314 (D. Del. 2003).

Cohen, seeking as Plan Administrator of the SubMicron
estates to aid unsecured creditors "cut out of the deal" by the
Lenders and Sunrise, attacks the sale on several fronts.  First, he
argues that the purportedly secured debt investments made by
the Lenders and contributed to Akrion should have been
recharacterized by the District Court as equity investments.  In
the alternative, if the District Court did not err in declining to
recharacterize the investments as equity, Cohen contends that it
erred by failing to conclude that the debt was unsecured.  Even
if the District Court properly considered the debt secured, Cohen
challenges the propriety of the District Court's allowance of the
credit bid portion of Akrion's offer.  As a last option, Cohen
asserts that the District Court erred by declining to equitably
subordinate the Lenders' secured claims to those of creditors
with inferior claims.  For the reasons discussed below, we reject
these arguments and affirm the judgment of the District Court.

## I.  Facts and Procedural Posture

### A.      SubMicron's Financing

---

[3] This bankruptcy case is before the District Court because it
withdrew, pursuant to 28 U.S.C. § 157(d), the reference of the
case to the Bankruptcy Court for the District of Delaware.

Before its sale in bankruptcy, SubMicron designed, manufactured and marketed "wet benches"[4] for use in the semiconductor industry. By 1997, it was experiencing significant financial and operational difficulties. To sustain its operations in the late 1990s, SubMicron secured financing from several financial and/or investment institutions. On November 25, 1997, it entered into a $15 million working capital facility with Greyrock Business Credit ("Greyrock"), granting Greyrock first priority liens on all of its inventory, equipment, receivables and general intangibles. The next day, SubMicron raised another $20 million through the issuance of senior subordinated 12% notes (the "1997 Notes") to KB/Equinox (for $16 million) and Celerity (for $4 million) secured by liens behind Greyrock on substantially all of SubMicron's assets. Submicron subsequently issued a third set of notes in 1997 (the "Junior 1997 Notes") for $13.7 million, comprising $8.7 million of 8% notes and a $5 million note to The BOC Group, Inc. The Junior 1997 Notes were secured but junior to the security for the 1997 Notes. Despite this capital influx, SubMicron incurred a net loss of $47.6 million for the 1997 fiscal year.

A steep downturn in the semiconductor industry made 1998 a similarly difficult year for SubMicron. By August of that

_____

[4] Wet benches are automatic process tools used for cleaning and etching operations in semiconductor processing. *See* http://www.semiconductorglossary.com/default.asp?searchterm=wet+bench (last visited Dec. 27, 2005).

6

year, it was paying substantially all of the interest due on the 1997 Notes as paid-in-kind senior subordinated notes. On December 2, 1998, SubMicron and Greyrock agreed to renew the Greyrock line of credit, reducing the maximum funds available from $15 to $10 million and including a $2 million overadvance conditioned on SubMicron's securing an additional $4 million in financing. To satisfy this condition, on December 3, SubMicron issued Series B 12% notes (the "1998 Notes") to KB/Equinox (for $3.2 million) and Celerity (for $800,000). The 1998 Notes ranked *pari passu* with the 1997 Notes and the interest was deferred until October 1, 1999. SubMicron incurred a net loss of $21.9 million for the 1998 fiscal year, and at year's end its liabilities exceeded its assets by $4.2 million.

SubMicron's financial health did not improve in 1999. By March of that year, its management determined that additional financing would be required to meet the company's immediate critical working capital needs. To this end, between March 10, 1999 and June 6, 1999, SubMicron issued a total of eighteen Series 1999 12% notes (the "1999 Tranche One Notes") for a total of $7,035,154 (comprising nine notes to KB/Equinox totaling $5,888,123 and nine notes to Celerity totaling $1,147,031). The 1999 Tranche One Notes proved insufficient to keep SubMicron afloat. As a result, between July 8, 1999 and August 31, 1999, KB/Equinox and Celerity made periodic payments to SubMicron (the "1999 Tranche Two Funding") totaling $3,982,031 and $147,969, respectively. No notes were issued in exchange for the 1999 Tranche Two

7

Funding. Between the 1999 Tranche One Notes and the 1999 Tranche Two Funding (collectively, the "1999 Fundings"), KB/Equinox and Celerity advanced SubMicron a total of $9,870,154 and $1,295,000, respectively. (The 1999 Fundings were recorded as secured debt on SubMicron's 10-Q filing with the Securities and Exchange Commission.) Despite the cash infusions, during the first half of 1999 SubMicron incurred a net loss of $9.9 million. On June 30, 1999, SubMicron's liabilities exceeded its assets by $3.1 million.

By January 1999, KB/Equinox had appointed three members to SubMicron's Board of Directors. All appointees were either principals or employees of KB/Equinox. By June 1999, following resignations of various SubMicron Board members, KB/Equinox employees Bonaparte Liu and Robert Wickey, and Celerity employee Mark Benham, represented three-quarters of the Board, with SubMicron CEO David Ferran the lone Board member not employed by KB/Equinox or Celerity.

### B. The Acquisition

SubMicron began acquisition discussions with Sunrise in July of 1999. By all accounts, it was generally understood that if SubMicron failed to reach a deal with Sunrise, it would be forced to liquidate, leaving secured creditors—with the exception of Greyrock—with pennies on the dollar and unsecured creditors and shareholders with nothing.

KB/Equinox, not SubMicron's management, conducted negotiations with Sunrise, developing and agreeing on the terms and financial structure of an acquisition to occur in the context of a prepackaged bankruptcy.

On August 31, 1999, SubMicron entered into an asset purchase agreement with Akrion, the entity created by Sunrise to function as the acquisition vehicle. The following day, SubMicron filed a Chapter 11 bankruptcy petition and an associated motion seeking approval of the sale of its assets to Sunrise outside the ordinary course of business pursuant to § 363(b) of the Bankruptcy Code.

The asset purchase agreement reiterated, *inter alia*, that KB/Equinox and Celerity would contribute their secured claims (*i.e.*, the 1997 Notes, the 1998 Notes and the 1999 Fundings) in order for Akrion to credit bid these claims under § 363 of the Bankruptcy Code—but only contingent on the closing of the sale. The agreement also required SubMicron, at the closing of the sale, to pay $5,500,000 immediately to the holders of the 1999 Fundings. In return, KB/Equinox and Celerity would receive a 31.475% interest in Akrion (KB/Equinox received a 30% interest and Celerity received a 1.475% interest). The Court and Official Committee of Unsecured Creditors (the "Creditors' Commitee") were apprised of the terms of this agreement prior to the sale.

At the sale hearing Akrion submitted a bid of

$55,507,587 for SubMicron. The cash component of the bid totaled $10,202,000 and included $5,500,000 in cash from Akrion, $3,382,000 to pay pre- and post-petition Greyrock secured debt, and $850,000 to cover administrative claims.[5] The credit portion of the bid consisted of the $38,721,637 outstanding for the 1997 Notes, the 1998 Notes, and the 1999 Fundings (all of which KB/Equinox and Celerity had contributed to Akrion), plus $1,324,138 in individual secured claims, for a total of $40,045,775. Finally, the bid included SubMicron's liabilities that would be assumed by Akrion—$681,346 in lease obligations and $4,578,466 in other assumed liabilities for a total of $5,259,812. No other bid for SubMicron's assets was made, SubMicron's Board and the Court both approved Akrion's bid over the objection of the Creditors' Committee, and on October 15, 1999, the asset sale closed.

On April 18, 2000, the Creditors' Committee brought against the Lenders, among others, an adversary proceeding in which it made the claims before us on appeal. (Cohen was subsequently substituted for the Creditors' Committee.) After a bench trial before Judge Sue Robinson in late July/early August 2001, she ruled against Cohen, setting out her reasoning in a comprehensive opinion. Cohen appeals.

---

[5] These enumerated components of the cash portion of the bid total $9,732,000, not $10,202,000. The District Court's opinion leaves unclear what accounted for the missing $470,000.

10

## II. Jurisdiction and Standard of Review

Because the typical reference of bankruptcy cases to bankruptcy courts was withdrawn here by the District Court, our appellate jurisdiction stems from 28 U.S.C. § 1291, not 28 U.S.C. § 158(d). *In re PWS Holding Corp.*, 228 F.3d 224, 235 (3d Cir. 2000); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 470 (3d Cir. 1998). "We review the District Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re PWS Holding Corp.*, 228 F.3d at 235 (citing *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999)).

## III. Recharacterization as Equity

Cohen argues that the District Court erred by failing to recharacterize the infusion of the 1999 Fundings as an equity investment. To succeed with this argument, he must demonstrate that the District Court abused its discretionary authority or premised its determination on clearly erroneous findings of fact. Because he has failed to do so, we affirm the District Court's recharacterization holding.

### A.    Recharacterization / Equitable Subordination

At the outset, it is important to distinguish recharacterization from equitable subordination. Both remedies

11

are grounded in bankruptcy courts' equitable authority[6] to ensure "that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305 (1939). Yet recharacterization and equitable subordination address distinct concerns. Equitable subordination is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants. *See, e.g.*, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3d Cir. 1998); *Bayer Corp. v. MascoTech, Inc.* (*In re Autostyle Plastics, Inc.*), 269 F.3d 726, 749 (6th Cir. 2001). In contrast, the focus of the recharacterization inquiry is whether "a debt actually exists," *In re Autostyle Plastics*, 269 F.3d at 748 (internal

---

[6] Bankruptcy courts' general powers of equity are codified at 11 U.S.C. § 105(a), which states that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." The power of equitable subordination is specifically codified at 11 U.S.C. § 510(c), which states that,

> after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

quotation marks omitted) or, put another way, we ask what is the proper characterization in the first instance of an investment.[7] For these reasons, we agree with those courts that have determined that "the issues of recharacterization of debt as equity capital and equitable subordination should be treated separately." *Blasbalg v. Tarro* (*In re Hyperion Enters., Inc.*), 158 B.R. 555, 560 (D.R.I. 1993); *see*, *e.g.*, *In re Autostyle Plastics*, 269 F.3d at 749 (explaining that "[b]ecause both recharacterization and equitable subordination are supported by the Bankruptcy Code and serve different purposes, we join those courts that have concluded that a bankruptcy court has the power to recharacterize a claim from debt to equity" and collecting cases); *Aquino v. Black* (*In re AtlanticRancher, Inc.*), 279 B.R. 411, 433 (Bankr. D. Mass. 2002) (stating that "while once considered solely in conjunction with the doctrine of equitable subordination, bankruptcy courts now consider

---

[7] In this context, the label "*re*characterization" is misleading. *See Citicorp Real Estate, Inc. v. PWA, Inc.* (*In re Georgetown Bldg. Assocs. Ltd. P'ship)*, 240 B.R. 124, 137 (Bankr. D.D.C. 1999) ("The debt-versus-equity inquiry is not an exercise in *recharacterizing* a claim, but of *characterizing* the advance's true character." (emphases in original)); *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("Rather than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset.").

13

recharacterization a separate cause of action").

Cohen advances both arguments. He argues that the infusion of the 1999 Fundings is most accurately characterized as an equity investment—a recharacterization argument—and, in the alternative, that if the infusion is deemed a debt investment, the Lenders' claims should be equitably subordinated. We turn first to the recharacterization argument, as "[d]etermining [an] equitable subordination issue prior to determining whether [an] advance is a loan or [an equity investment] is similar to taking the cart before the horse." *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla., 1990). If a "particular advance is a capital contribution, . . . . then equitable subordination never comes into play." *In re Georgetown Bldg. Assocs.*, 240 B.R. at 137.

## B.  Recharacterization Framework

In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw.[8]   While these tests undoubtedly

---

[8] In *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625 (6th Cir. 1986), the Court of Appeals for the Sixth Circuit laid out eleven factors to determine whether an investment was debt or equity in the context of assessing income tax liability. *Id.* at 630. *In re Autostyle Plastics* extended the use of those factors to the recharacterization context. 269 F.3d at 749–50. They are:

14

(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Roth Steel Tube Co.*, 800 F.2d at 630.

The Courts of Appeal for the Eleventh and Fifth Circuits also employ a multi-factor test in the tax context. They have identified the following thirteen factors:

(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between

15

creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.

*Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984) (citing *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)).

*In re Cold Harbor Assocs., L.P.*, 204 B.R. at 915, discussed both of the above tests in the recharacterization context and applied the factors relevant to that case, and *In re Georgetown Bldg. Assocs.*, 240 B.R. at 137, cited with approval *Cold Harbor*'s use of these factors in the recharacterization context (but found it unnecessary to adopt formally a specific set of factors).

In this case, the District Court applied a seven-factor test used in an unpublished District of Delaware case that was bankruptcy related, *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship* (*In re Color Tile, Inc.*), No. Civ. A. 98-358-SLR, 2000 WL 152129 (D. Del. Feb. 9, 2000) (Robinson, J.). Those factors are

(1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate

include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. While some cases are easy (*e.g.*, a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's

---

contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.

*In re SubMicron Sys.*, 291 B.R. at 323 (citing *In re Color Tile*, 2000 WL 152129, at *4).

17

fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

**C. Review of the District Court's Recharacterization Holding**

### i) Standard of Review

We must first determine whether the District Court's recharacterization conclusion is a finding of fact we review for clear error or a conclusion of law over which we exercise plenary review. Direct precedent on this issue is lacking,[9] but several courts have considered this issue in the tax context.

In tax cases addressing whether for tax purposes a

---

[9] Research has uncovered only one bankruptcy case discussing whether the capital contribution versus loan determination question is primarily one of law or fact. There the Court concluded that "[t]he issue of classification of an advance presents a question of law subject to *de novo* review." *Celotex Corp. v. Hillsborough Holdings Corp.* (*In re Hillsborough Holdings Corp.*), 176 B.R. 223, 248 (M.D. Fla. 1994) (citing *Lane v. United States* (*In re Lane*), 742 F.2d 1311 (11th Cir. 1984), a tax refund case).

contribution should be treated as debt or equity, courts of appeal are split. The United States Courts of Appeals for the Sixth and Ninth Circuits have concluded the issue is one of fact to be reviewed for clear error. *Roth Steel Tube*, 800 F.2d at 629 (citing *Smith v. Comm'r*, 370 F.2d 178, 180 (6th Cir. 1966)); *Bauer v. Comm'r*, 748 F.2d 1365, 1367 (9th Cir. 1985) (citing *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1334 (9th Cir. 1970)). The Fifth and Eleventh Circuit Courts of Appeals, on the other hand, have held the issue to be primarily one of law subject to *de novo* review. *Lane v. United States* (*In re Lane*), 742 F.2d 1311, 1315 (11th Cir. 1984); *Estate of Mixon v. United States*, 464 F.2d 394, 402–03 & n.13 (5th Cir. 1972).[10] In our Court, we were called upon to review a debt versus equity determination in the tax context in *Geftman v. Comm'r*, 154 F.3d 61 (3d Cir. 1998), but we eschewed entering the thicket of deciding whether we were reviewing a finding of fact or a conclusion of law. *See id.* at 68 n.9.

As discussed above, the determinative inquiry in

---

[10] Of course, it could be argued that the Eleventh Circuit did not reach this conclusion of its own accord. When the former Fifth Circuit was split into the Fifth and Eleventh Circuits on October 1, 1981, the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit handed down as of September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981). Thus, *Mixon* was binding precedent for the *Lane* Court.

classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction. So framed, we agree with our Sixth and Ninth Circuit colleagues that this is a question of fact that, "once resolved by a district court, cannot be overturned unless clearly erroneous." *A.R. Lantz Co.*, 424 F.2d at 1334.

## ii) The District Court's Determination Was Not Clearly Erroneous

The District Court's opinion includes ample findings of fact to support its recharacterization determination. Because these findings are not clearly erroneous and overwhelmingly support the Court's decision to characterize the 1999 Fundings as debt (under any framework or test), we affirm its factual determination.

The District Court set out numerous facts to support a debt characterization. Looking to the lending documents, it found "beyond dispute in the record that . . . the name given to the 1999 fundings was debt . . . and . . . the 1999 fundings had a fixed maturity date and interest rate." *In re SubMicron Sys.*, 291 B.R. at 325. The Court also found evidence of the parties' intent to create a debt investment outside the lending documents. For example, it noted that "[t]he 1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing and UCC-1 financing statements." *Id*. at 319.

20

The District Court could not find, on the other hand, convincing evidence to support an equity investment characterization of the 1999 Fundings. It rejected Cohen's argument that the dire financial circumstances surrounding the infusion of the 1999 Fundings supported an equity characterization. Instead, it concluded, with reference to the conflicting testimony and relative credibility of witnesses presented by both parties, that Cohen "failed to prove that[,] under SubMicron's dire circumstances, [the Lenders'] transactions were improper or unusual [as debt investments]." *Id*. at 325. Recognizing that "'[w]hen a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital,'" *id*. (quoting *In re Autostyle Plastics*, 269 F.3d at 746–47), the District Court also noted that "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company," *id*. Weighing these competing considerations, it did not find SubMicron's undercapitalization greatly supported an equity characterization. *Id*.

Similarly, the Court found the Lenders' participation on the SubMicron Board did not, in and of itself, provide support for an equity characterization. Again relying on expert testimony, it emphasized that it is "not unusual for lenders to

21

have designees on a company's board, particularly when the company [is] a distressed one." *Id*. at 325–26. After reviewing conflicting evidence on the issue, the Court concluded that Cohen "[did] not prove[] that [Lenders] or their designees controlled or dominated SubMicron's Board in any way." *Id*. at 326. Based on these factual determinations, the conclusion was inevitable that the Lenders' representation on SubMicron's Board did not necessarily support an equity characterization.

Lastly, the Court found unpersuasive Cohen's argument that SubMicron's failure to issue notes for the 1999 Tranche Two Funding should be understood as evidence of the parties' understanding that the 1999 Fundings were, in effect, equity investments. It noted that "[t]he record is clear that SubMicron's accounting department made numerous mistakes and errors when generating notes," concluding that "[t]he fact that notes were generated for some fundings and not others is not sufficient, in and of itself, to recharacterize the 1999 fundings as equity." *Id*. at 326.

In short, the District Court found ample evidence to support a debt characterization and little evidence to support a characterization of equity infusion. On the basis of these findings, which comport with the record, it was hardly clear error for the Court to conclude that "[Cohen] ha[d] not proven by a preponderance of the evidence that the 1999 [F]undings should be recharacterized as equity." *Id*. at 325.

22

## IV. The 1999 Fundings Were Secured Debt

Having established that the District Court properly concluded the 1999 Fundings were debt, we turn to Cohen's assertion that the Lenders did not present a valid *secured* claim. In determining whether claims asserted by creditors in bankruptcy are secured, state law applies. *See In re Bollinger Corp.*, 614 F.2d 924, 925 n.1 (3d Cir. 1980). Cohen concedes that, whether one applies Delaware, Pennsylvania, California or New York law, the requirements to obtain a security interest are the same. Thus each state's codification of Uniform Commercial Code ("U.C.C.") §§ 9-203 and 9-302 existing in 1999[11] requires a written security agreement in favor of the lender describing the collateral and, for the collateral in question (inventory, equipment, receivables and general intangibles), the filing of a properly executed financing statement (unless the inventory and equipment are possessed by the lender or its representative, something normally, and here highly, impractical).

Cohen contends that the Lenders did not comply with state U.C.C. law (and thus the requirements for assertion of a secured claim). The main source of contention is that financing statements filed by the Lenders only list "Equinox Investment

---

[11] Since then, a revised Article 9 has been adopted in each state.

23

Partners, LLC, as Collateral Agent," as the secured party.[12] Cohen asserts that the listing of Equinox solely (and not also KB and Celerity) rendered the financing statement ineffective under the then-extant U.C.C. § 9-402(1), which stated that a "financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral." Official Comment 2 to then-U.C.C. § 9-402 indicated that Article 9 employed a "notice filing" system whereby financing statements needed only to indicate that a secured party "*may* have a security interest in the collateral described. Further inquiry from the parties concerned . . . [may] be necessary to disclose the complete state of affairs." (Emphasis added.) In this context, "[t]he Uniform Commercial Code does not require that the secured party as listed in [a financing] statement be a principal creditor and not an agent." *Indus. Packaging Prods. Co. v. Fort Pitt Packaging Int'l, Inc.*, 161 A.2d 19, 21 (Pa. 1960). Because the financing statements name both SubMicron as debtor and Equinox as secured party, provide mailing addresses for both entities, and describe the

---

[12] No claim is made that a security interest in the collateral was not created (the security agreements for the 1997 Notes and the 1998 Notes state that the collateral secures "the payment of all present and future indebtedness"), only that it was not properly perfected.

collateral that is subject to the security agreement, we conclude that any interested party would be on notice to communicate with Equinox regarding the status of its (and its principals') interest in SubMicron's assets. This is sufficient for Article 9 perfection purposes. *Id.*

We also conclude that, on the record before us, there can be no doubt that KB and Celerity were intended secured parties served by their agent, Equinox. Indeed, in the schedule of liabilities filed with the District Court, SubMicron lists KB and Celerity as secured noteholders. The District Court found on the basis of overwhelming evidence that KB and Celerity were intended secured parties with respect to the 1999 Fundings and we discern no basis to believe this determination was erroneous. In sum, we conclude that the Lenders presented valid secured claims for the 1999 Fundings.

## V. Propriety of § 363 Credit Bid

Having determined that the 1999 Fundings represented an extension of secured debt, we turn to Cohen's argument that the § 363(k) credit bid was improper because the Lenders did not (and could not) demonstrate that some portion of their claims remained secured by collateral as defined in Bankruptcy Code § 506(a).[13] The District Court determined that "there was

---

[13] This provision reads in pertinent part:

An allowed claim of a creditor secured by a lien on

25

no collateral available to actually secure the 1999 fundings." *In re SubMicron Sys.*, 291 B.R. at 327. As a result, Cohen argues that, because the secured debt had no actual (or economic) value, it could not be credit bid under § 363(k). Because that section empowers creditors to bid the total *face* value of their claims—it does not limit bids to claims' economic value—we disagree and hold that the District Court did not err in allowing the Lenders to credit bid their claims.

It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k). *See, e.g., In re Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("[T]he plain language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof." (emphasis in original)); *In re Morgan House Gen. P'ship*, Nos. 96-MC-184 & 96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may bid "to the extent of [their] claim" under § 363(k)); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n.12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's

---

property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.
11 U.S.C. § 506(a).

allowed claim, including the secured portion and any unsecured portion thereof" (citing legislative history) (alteration in original) (internal quotation marks omitted)); *In re Realty Invs., Ltd. V,* 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (same); *see also Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC* (*In re WDH Howell, LLC)*, 298 B.R. 527, 532 n.8 (D.N.J. 2003).

In fact, logic demands that § 363(k) be interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical.

A hypothetical is illustrative.

Assume that Debtor has a single asset: a truck, T. Lender is a secured creditor that has loaned Debtor $15, taking a security interest in T. Debtor is in Chapter 11 bankruptcy and has filed a § 363 motion to sell T to Bidder for $10. Debtor argues that Lender can only credit bid $10 for T and must bid any excess in cash if it wishes to outbid B.

This hypothetical reveals the logical problem with an actual value bid cap. If Lender bids $12 for T, by definition $12 *becomes* the value of Lender's security interest in T. In this way, until Lender is paid in full, Lender can always overbid Bidder. (Naturally, Lender will not outbid Bidder unless Lender believes it could generate a greater return on T than the return

27

for Lender represented by Bidder's offer.)  As Lender holds a security interest in T, any amount bid for it up to the value of Lender's full claim becomes the secured portion of Lender's claim by definition.[14]  Given the weight of reason's demand that "it must be so," we see no reason to catalog the myriad other arguments that have been advanced to support this

---

[14] Precisely this logical argument was presented in *In re Realty Invs., Ltd V*:

> An argument might be made that the "allowed claim" referred to in the Congressional Record is only the secured portion of [the creditor]'s claim. But this is an argument of form and not of substance.
>
> Until [the nonrecourse undersecured lender] is paid in full, any bid received is subject to overbid by [the lender].  If [the bidder]'s bid were valued [below the full value of the lender's claim], [the lender] could overbid it, and [the lender]'s bid would then become, by definition, the "allowed" claim. . . . [I]t is practical that [the lender] will bid in its entire obligation and therefore that is its "allowed" claim.  Because no one could buy the property without [the lender]'s consent, unless [the lender] is paid in full, the "allowed claim" of [the lender] must (for purposes of credit bidding) be its total claim without reference to the "value" of the property.

72 B.R. at 146.

"interpretation."[15]

---

[15] We pause nonetheless to note one such argument, in the mode of statutory interpretation, that is based on the exception for § 363 sales contained in § 1111(b)(1)(A)'s statutory protection for nonrecourse creditors (that is, in the event of the borrower's default, the creditor may not look to the borrower for repayment, and thus is limited to its security, if any).  The latter was "enacted by Congress to cure the harsh result of *Great National Life Ins. Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr. N.D. Ga. 1976)."  *Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd.* (*In re Tampa Bay Assocs., Ltd.*), 864 F.2d 47, 49 (5th Cir. 1989).  In *Pine Gate*, a secured creditor holding a nonrecourse lien against real property unsuccessfully objected to the bankruptcy sale of the property at a dramatically depressed price.  The case made clear that "under the former Bankruptcy Act a debtor could file bankruptcy proceedings during a period when real property values were depressed, propose to repay secured [nonrecourse] lenders only to the extent of the then-appraised value of the property, and 'cram down' the secured lender class, preserving any future appreciation of the property for the debtor." *Id.* at 50.  Congress attempted to remedy this problem by enacting § 1111(b)(1)(A), which "provid[es] such creditors with an opportunity to elect to have their liens treated as recourse claims if their debtors intend to retain the property secured . . . ." *Id.*  The provision explicitly excepts sales of property under § 363, however.  11 U.S.C. § 1111(b)(1)(A)(ii).

The rationale for this exception presupposes that § 363(k) credit bidders can bid the full value of their secured claims.

29

Cohen is not out of plausible arguments, however, as he claims that because the Lenders were not *partially* undersecured but *completely* undersecured—that is, because the collateral was found to have no economic value—this case is different. Yet nothing about the logic of allowing credit bids up to the full face value of the collateral changes if the collateral has no actual value. Because the Lenders had a valid security interest in

---

"Congress intended to protect the nonrecourse undersecured creditor only if such a creditor is not permitted to purchase the collateral at a sale or if the debtor intends to retain the collateral after bankruptcy and not repay the debt in full." *In re Tampa Bay Assocs.*, 864 F.2d at 50. Congress deemed the undersecured nonrecourse creditor's ability to credit bid the *full* value of his claim adequate protection in the § 363 context, rendering § 1111(b)(1)(A) unnecessary:

> The legislative history verifies this congressional intent in limiting the applicability of the statutory recourse status: "Sale of property under [§] 363 or under the plan is excluded from treatment under [§] 1111(b) because of the secured party's right to bid *in the full amount of his allowed claim* at any sale of collateral under section 363(k) . . . ."

*Id.* (quoting 124 Cong. Rec. H11,103-04 (1978)) (omission in original) (emphasis added). Because an undersecured nonrecourse creditor is protected to the full extent of its claim by virtue of its ability to bid up to the full value of that claim under § 363(k), Congress concluded that § 1111(b)(1)(A) need not apply to § 363 sales.

30

essentially all the assets sold, by definition they were entitled to the satisfaction of their claims from available proceeds of any sale of those underlying assets. Their credit bid did nothing more than preserve their right to the proceeds, as credit bids do under § 363(k).

Unable squarely to rest this argument on a theoretically sound construction of the Bankruptcy Code's credit bidding provisions, Cohen enlists the aid of 11 U.S.C. § 506(a), which provides for the splitting of partially secured claims into their secured claim and unsecured claim components. Yet § 506(a) is inapplicable. As one member of the Supreme Court has explained, "[w]hen . . . the Bankruptcy Code means to refer to a secured party's entire allowed claim, *i.e.*, to both the 'secured' and 'unsecured' portions under § 506(a), it uses the term '*allowed claim*'—*as in 11 U.S.C. § 363(k)* . . . ." *Dewsnup v. Timm*, 502 U.S. 410, 422 (1992) (Scalia, J., dissenting) (first emphasis in original). That is, § 363(k) speaks to the full face value of a secured creditor's claim, not to the portion of that claim that is actually collateralized as described in § 506.

Moreover, as a practical matter, no § 506 valuation is required before a § 363 sale of the underlying collateral can be approved. Section 363 attempts to *avoid* the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of

31

assets' worth. Naturally, then, courts are not required first to determine the assets' worth before approving such a market sale. This would contravene the basis for the provision's very existence.

For these reasons, we conclude that the District Court properly allowed the Lenders to contribute their credit bids under the §363 sale.

## VI. Equitable Subordination

Cohen also argues that the Lenders' claims related to the 1999 Fundings should be equitably subordinated to the claims of the general unsecured creditors. In *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, we explained that

> [b]efore ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the [B]ankruptcy [C]ode.

160 F.3d 982, 986–87 (3d Cir. 1998) (citing *United States v.*

32

*Noland*, 517 U.S. 535 (1996)). We declined, however, to adopt the first generally recognized element as a formal requirement for equitable subordination, noting instead that because the Bankruptcy Court in *Citicorp Venture Capital* properly found inequitable conduct, there was no "need . . . [to] resolve the issue of whether misconduct is always a prerequisite to equitable subordination . . . ."[16]  160 F.3d at 987 n.2. In a similar vein, because the District Court found in our case, through a proper exercise of its discretion, that no injury resulted to SubMicron's unsecured creditors as a result of the Lenders' dealings with Akrion, we need not reach the issue of inequitable conduct in order to affirm the District Court's equitable subordination holding.

As the District Court explained, the doctrine of equitable subordination "is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." 291 B.R. at 327 (citing *Trone v. Smith* (*In re Westgate-California Corp.*), 642 F.2d 1174, 1178 (9th Cir.1981)); *see also Citicorp Venture*

---

[16] Our hesitancy to adopt an inequitable conduct requirement in *Citicorp Venture Capital* stemmed from our prior holding in *In re Burden v. United States*, 917 F.2d 115, 120 (3d Cir. 1990), that "creditor misconduct is not [always] a prerequisite for equitable subordination." As we explained, "*Burden* involved subordination of a tax penalty in the absence of government misconduct." 160 F.3d at 987 n.2.

33

*Capital*, 160 F.3d at 991 ("A bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination."); *Stoumbos v. Kilimnik*, 988 F.2d 949, 960 (9th Cir. 1993) ("A claim will be subordinated only to the claims of creditors whom the inequitable conduct has disadvantaged."); *Estes v. N & D Props., Inc.* (*In re N & D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986) (stating that "equitable subordination operates only to redress the amount of actual harm done").

Considering Cohen's equitable subordination claim, the District Court held:

> [P]laintiff has failed to show that . . . the unsecured creditors suffered any harm as the result of defendants' actions.

> The trial testimony is uncontradicted that had defendants not made the 1999 [F]undings to SubMicron, the company would have been forced to close down and liquidate, leaving the unsecured creditors with nothing.

> Furthermore, the record shows that there were no other parties interested in acquiring SubMicron at the time of the bid. Plaintiff has

34

failed to show that any other party was willing to bid on SubMicron at any price. In fact, the testimony shows that Sunrise/Akrion was the deal of last resort for SubMicron and the company aggressively sought other suitors prior to the Sunrise/Akrion deal. Given these facts, plaintiff has not proven that any harm resulted from any improper double bidding or inflated bid price.

*In re SubMicron Sys.*, 291 B.R. at 329.

The record supports the Court's findings, and Cohen barely argues otherwise.[17] Further, Cohen points to no evidence

_____

[17] While the last major heading in Cohen's Opening Brief is that "The Record Contains Overwhelming Evidence That The Appellees Breached Their Fiduciary Duties and Their Claims Should be Equitably Subordinated," Cohen Op. Br. at 51, little argument even implies the District Court's findings were entered in error.

As an aside, we note that Cohen recites the generalization that Delaware courts have held that directors' fiduciary duties extend to creditors as well as shareholders once a debtor is in the "vicinity of insolvency." *Id.* at 52 (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, Civ. A. No. 12150, 1991 WL 277613, at *34 & n.55 (Del. Ch. Dec. 30, 1991)). The recent Delaware Chancery Court opinion of Vice Chancellor Strine in *Production Resources Group, L.L.C.*

35

showing that unsecured creditors were in any way disadvantaged or harmed by the sale of assets.[18]  In this context, equitable subordination would serve no purpose and the Court thus properly denied Cohen's claim.

* * * * *

We affirm the District Court's approval of the § 363 sale of SubMicron's assets.

---

*v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004), addresses the extent of director duties when a corporation is insolvent. *Id.* at 787–93.  In so doing, the Vice Chancellor clarifies inaccurate generalizations of *Credit Lyonnais* that have gained traction from uncritical repetition.

[18] Indeed, it appears the 1999 Fundings benefitted unsecured creditors by enabling SubMicron to pay operating expenses and to avoid a Chapter 7 liquidation.